**J. D. HEDIN CONSTRUCTION COM-
PANY, Inc.**

v.

**The UNITED STATES.**

**No. 121–60.**

United States Court of Claims.

March 14, 1969.

Thomas H. McGrail, Washington, D. C., for plaintiff; J. Roy Thompson, Jr., Washington, D. C., attorney of record. Thompson, McGrail & O'Donnell, Washington, D. C., of counsel.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, LARA-MORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

Early in 1955 plaintiff agreed with the Veterans Administration to construct additional buildings at the Administration's hospital in Marion, Indiana, for a price of almost $2,000,000. Notice to proceed was given on February 14, 1955, and the work was to be completed within 500 days, i. e. June 28, 1956. On November 29, 1956—154 days beyond the completion date—the contracting officer terminated plaintiff's right to proceed.[1] He invoked Clause 5(a) ("Termination for Default—Damages for Delay—Time Extensions") which authorized a default termination "[i]f the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time * *." The notice of termination also called upon Clause 9(a) ("Inspection") which gave the contracting officer authority to reject defective material and workmanship or require its correction, and to direct the contractor to correct and replace the rejected work and material; "[i]f the Contractor fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship the Government may * * * terminate the right of the Contractor to proceed as provided in Clause 5 * * *."

---

1. The work was 60% complete at that time.

Plaintiff's position was that it was not in default, either on the score of delay or because of defective workmanship or materials. As for the former, it contended that it was entitled to time-extensions under Clause 5(c) which specified that the "right of the Contractor to proceed shall not be terminated * * because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor * * *." The claim was that, if the contracting officer properly extended the contract completion date under this provision, the job would have been current on November 29, 1956, the date of the termination, and certainly would not then have been in default.

Plaintiff's appeal was heard in 1958 by the Veterans Administration Construction Contract Appeals Board, under an antiquated procedure which we shall describe later. Meanwhile, a successor contractor was hired to continue with the work; notice to proceed was given this firm on January 9, 1957, and it completed the project on February 10, 1958 (over a year later).

In September 1959, the Board recommended to the V.A.'s Assistant Administrator for Construction—the official designated to determine building contract disputes—that the default termination be upheld. The Assistant Administrator (in November 1959) approved and adopted this recommendation, as well as the Board's opinion. The result of this ruling, together with subsidiary determinations later made by the Board, was that plaintiff was assessed (i) with liquidated damages of $155,400 (at $300

per day) for 518 days (from the original completion date to the day the successor contractor actually finished the job, less short extensions administratively granted plaintiff in connection with two of the disputed items), and (ii) with the sum of $8,769.33 for V.A.'s expenses of protecting the work in place immediately after termination and before the successor contractor came on the site.[2]

In its suit here Hedin challenges the Board's findings and determinations, and asks damages for the breach it says occurred when the Government improperly defaulted it on November 29, 1956 (as well as for other lesser breaches). Both parties have moved for summary judgment on the administrative record, the trial commissioner having denied plaintiff's demand for a *de novo* trial.[3]

Faced with 1059 pages of motions and briefs from the parties,[4] and a Board opinion mounting to 277 pages, Commissioner Gamer has evaluated the record in a detailed, careful, thorough and perceptive opinion (of 212 pages), with which we generally agree (except for the matter dealt with in Part V, *infra*). He has treated with each ground upon which the Board sustained the default termination and with each argument raised by the defendant, concluding that the default termination was improper.[5] Though for the largest part we agree with the commissioner's discussion—without stopping to decide whether we approve every word, every sentence, or every nuance—and base our judgment on it, we do not adopt it *in extenso* as our own opinion because it is unavoidably long, detailed, and tied to the particular circumstances of this individual case.

2. The Board increased this sum to $9,-009.50, and the defendant has counter claimed for $240.17, representing the difference between that sum and the $8,769.-33 originally assessed and collected.

3. The court earlier affirmed this ruling "without prejudice" (Order of April 17, 1964). Plaintiff does not now seek a *de novo* trial or renew its earlier contention.

4. The parties have now added 212 pages of briefs to the court on review of the commissioner's recommendation. The to-

tal of the written arguments we have been asked to consider is therefore 1271 pages.

5. In certain respects the commissioner upheld the Board (mainly in "Forms for Footings"; "Soil Conditions Necessitating the Lowering of Certain Footings" (in part); "Shelf Angles and Bondstone"). The plaintiff has not sought review of those adverse aspects of the commissioner's opinion, and we accept them as correct.

However, the underpinning of our conclusions is found in that opinion, and our failure to adopt it as our own does not mean that we reject or differ significantly from it (except to the extent indicated in Part V, *infra*). It has been indispensable to our review and forms the essential foundation for our holdings.

## I.

Under the Veterans Administration's then procedures (38 CFR §§ 1.750–1.755 (1956)), appeals were heard in a way now happily considered obsolete. For one thing, the contracting officer's findings of fact with respect to the termination were prepared subsequent to the plaintiff's notice of appeal, and in piecemeal stages. Then, the plaintiff put on its case *ex parte* in informal proceedings before the Board, at which the contracting officer and the procurement officials were not represented officially; such cross-examination as there was came from the Board members. After plaintiff's case was put on and the transcript made available to the procurement officials, the Board collected materials for the Government's side, including written comments on the testimony of plaintiff's witnesses, solicited statements, affidavits, etc.[6] There was no oral testimony by witnesses for the Government and they were not subject to cross-examination by anyone. The contracting officer's case was put in wholly *ex parte*, via written statements, documents, and photographs.

The contractor first had its opportunity to see and comment on the materials collected by the Board for the Government's side when the Board submitted a draft of its proposed determinations and findings. The plaintiff then had a period "to submit such further pertinent *written* evidence, data, and arguments as he may desire in support of his contentions" (38 CFR § 1.754(a) (1956) (emphasis added)). These additional materials were to be considered by the Board "before rendition of its final report to the Assistant Administrator for his decision" (38 CFR § 1.754(b) (1956)). As already indicated, the Assistant Administrator made the ultimate determination.

The result of this hybrid procedure was that none of the Government's evidence was testimonial or subject to cross-examination, while a good part of the plaintiff's was oral (though unsworn, under Board practice) and subject to inquiry, if not by counsel for the procuring officials, then by the members of the Board. Moreover, both presentations were primarily *ex parte*, not meshing or meeting head-on in the way true adversary proceedings are wont to do.

■ Despite these defects, we agree with the trial commissioner that the existing record is barely adequate to determine the issue of default and that a new trial need not be held on that question. In the milieu of the 1950's in which this Board hearing was conducted, it was not a clear violation of due process or the Wunderlich Act to base the administrative determination on this type of *ex parte*, layered, informal proceeding. Many such "hearings" were held and we cannot say that, in that era, they were wholly invalid.[7]

■ However, we agree, too, that the character of the hearing, and especially

---

6. The regulation (38 CFR § 1.753(c) (6) (1956) provided that "[u]pon completion of the proceeding [*i. e.*, the contractor's appearance], the Board will consider all of the facts before it, obtaining and including such further data, evidence or testimony as the Board may, in its judgment, consider to be necessary for a proper adjudication of the issues."

7. With a case as old as this and embracing so many separate items and so big a record, we believe that the court should be quite certain that it cannot properly dispose of the issue of liability on the existing record before ordering that the whole matter be tried anew, so many years after the events and at such considerable cost.

Like the trial commissioner, we do not need to consider plaintiff's complaints that the Board proceeding was vitiated by special deficiencies peculiar to this case.

the nature of the conclusory written statements and remote hearsay on which the Board relied to a very large degree, deprive the administrative findings of the weight to which they would be entitled if there had been a true adversary process and the findings had been grounded in oral testimony subject to cross-examination (or on true documentary evidence subject to close scrutiny). *Cf.* Loral Electronics Corp., 387 F.2d 975, 980–981, 181 Ct.Cl. 822, 832–833 (1967); Sundstrand Turbo v. United States, 389 F.2d 406, 418, 182 Ct.Cl. 31, 52–53 (1968); Beckham v. United States, 392 F.2d 619, 622–623, 183 Ct.Cl. 628, 636 (1968). If the evidence on which the Board rests is weak and untested, it cannot be accorded the same status (in deciding whether the administrative findings are supported by substantial evidence in the record as a whole) as stronger, tested materials—and is consequently much more apt to be overborne by countervailing portions of the record. The marginal nature of the hearing-process, and of the evidence, necessarily infects the findings.

## II.

The most significant issue on the merits is whether plaintiff was delayed by a serious cement shortage beginning in May 1955, and, accordingly, was entitled to both a time-extension and freedom from liability to a default-termination. Clause 5(c) of the Default article excused the contractor for delays "due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor." [8] The Board refused to apply this provision because it found (i) that the cement shortage was not unforeseeable, and therefore that the contractor had not shown that it was faultless and nonnegligent in the precautions it took to obtain an adequate supply, and (ii) that the delay during that period was largely due to other factors, attributable to plaintiff, rather than to the lack of cement. The Board also minimized the extent of the shortage.

■■ Commissioner Gamer reviewed the record in great detail and concluded, correctly we think, that the Board's findings were not supported by substantial evidence in the record as a whole. We are convinced that the Board drastically downgraded the extent, unforeseeability, and gravity of the cement shortage in 1955.[9] We are also convinced that it imposed too high standards on plaintiff, expecting the latter to have prophetic insight and to take extraordinary preventive action which it is simply not reasonable to ask of the normal contractor. It is undeniable that plaintiff made heroic efforts to obtain cement—as the commis-

8. In full text, this provision is as follows:
"The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors or suppliers due to such causes: *Provided,* That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officer shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof."

9. The commissioner has recited in his opinion the "undisputed evidence relating to the extraordinary, widespread shortage of cement, and particularly affecting plaintiff at Marion, Indiana," and its "unforeseeability insofar as a construction contractor such as plaintiff was concerned."

sioner put it, "plaintiff scoured the areas from which it would have been reasonable or practical for it to obtain cement" [10]—but the Board insisted, unreasonably, on still greater efforts and on super-foresight. Cf. Mitchell Canneries, Inc. v. United States, 77 F.Supp. 498, 503–504, 111 Ct.Cl. 228, 250–251 (1948); Otis Williams & Co. v. United States, 120 Ct.Cl. 249, 273–274 (1951); Barling v. United States, 111 F.Supp. 878, 126 Ct.Cl. 34 (1953). "Unforeseen delays excusable under Article 9 [comparable to Clause 5(c) in the present contract] can not be arbitrarily limited to delays which subsequent to the event might within the range of possibility have been avoided. Where a contractor resorts to the usual and long-established methods employed by the commercial world in general to obtain material to perform the contract he has no cause to suspect that such instrumentalities will fail in the discharge of their duties." H. B. Nelson Constr. Co. v. United States, 87 Ct.Cl. 375, 389 (1938), cert. denied, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1058 (1939).

The commissioner also rejected, as without the support of substantial evidence, the administrative findings that much of the delay during this time was due to plaintiff's unsatisfactory relations with its ready-mix concrete supplier; its failure to reorganize the project so as to minimize the disruption of the planned sequence of operations; its lack of adequate equipment and labor; its performance of defective concrete work; and its failure to coordinate the work of the various trades. We concur in the commissioner's analysis of the record on these points. The materials tending to favor the Board's conclusions are not substantial when their nature and the rest of the evidence are taken into account. Cf. Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676, 691 (C.A.9), cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949); Davis, Hearsay in Administrative Hearings, 32 Geo.Wash.L. Rev. 689, 696 (1964). This part of the Board's opinion is particularly tainted by reliance on unsatisfactory hearsay, general surmise, conclusory written statements, and a collage of selected but trivial incidents. When plaintiff's side of the case (testimonial, in large part) is scrutinized impartially and the record evaluated as a whole, we think it clear that the delay must be attributed to the unforeseen cement shortage, not to plaintiff's fault or responsibility.

It follows, of course, that Hedin was entitled under Clause 5(c), *supra*, to an extension of the time for completion of the work on account of this cement shortage. When the contracting officer terminated plaintiff for default on November 29, 1956, the work was 154 days beyond the original completion date (June 28, 1956). Plaintiff was given by the contracting officer and the Board 30 days as a result of a soil condition which necessitated the lowering of the footings; some, perhaps all, of this delay was concurrent with that tied to the cement shortage. Plaintiff also received 44 days, with respect to the shelf-angle and bondstone problems, from the Board. Taking the soil-condition and shelf-angle extensions together with that which should have been allowed for the cement shortage, we conclude that the record compels a finding that on November 29, 1956, plaintiff was not in default under Clause 5 for delay in its work. The question of the precise amount of plaintiff's rightful time-extension we discuss in Part V, *infra*. Here it suffices to hold that the delay attributable to the cement shortage, the soil condition, and the shelf-angle difficulty was substantially more than 154 days and therefore that there was no default on the ground of delay on November 29, 1956. At that time plaintiff had not failed, in the words of Clause 5(a), "to prosecute the work * * * with

---

10. Defendant tries to turn this evidence into proof that plaintiff obtained all the cement it needed, but the Board found that the shortage did in fact delay the work and the record is conclusive that the contractor's receipts fell far short of the cement it needed and could use in 1955.

such diligence as will insure its completion within the time specified in this contract, *or any extension thereof*" (emphasis added).

## III.

The other basis for the default-termination was that the contractor had failed to replace rejected material and correct defective workmanship. Before the Board, plaintiff presented its position on some one hundred items of possible deficiencies, including many which the contracting officer did not cover in his findings of fact. The Board eliminated a large number, but left thirty-three items as supporting the termination. Commissioner Gamer has thoroughly discussed each of these, concluding that the record will not sustain any of them as such a deficiency.

■ We agree with the commissioner's legal rulings and his appraisal of the record. Among other things, the Board erroneously insisted on literal and unreasonably rigid compliance with the requirement of Clause 9(a) that the contractor "proceed at once" to replace rejected material and correct defective workmanship; that term must be read sensibly in the light of the particular circumstances, and cannot be made a "fetish" (as the commissioner put it) calling for an instantaneous response even though that be needless. Also, the Board considered charges against Hedin which the contracting officer had not included in his findings of fact giving the reasons for the termination, or which were so unclear and ambiguous that the contractor was hard put to figure out what was covered.[11] In certain instances, the Board treated temporary or unfinished work or installations (including work in process) —even though reasonable at that particular stage of the work—as defective because, understandably, the work did not conform at that time with the final product demanded by the specifications. Also, there is no substantial evidence to support several Board findings in which reliance is placed on speculation or summary written denials, rather than firm evidence.[12] In some cases the Board

---

11. The Board may have considered these items because plaintiff discussed them, and plaintiff may have discussed them because it feared that they would be deemed part of the case against it and thus considered to be conceded if not discussed. The whole procedure with respect to the deficiencies charged against plaintiff was most slipshod and confusing. Shortly after the termination, the resident engineer (who was not the contracting officer) gave the contracting officer a memorandum on the contractor's unsatisfactory work; this listed some 52 items. Thereafter the contracting officer issued his findings (prepared after Hedin had noted its appeal to the Board) which were very summary and undetailed as to the deficiencies and did not purport on their face to adopt the resident engineer's more specific memorandum. Half a year later (July 25, 1957), the contracting officer supplemented his findings with some details, quoted from the resident engineer's pre-termination reports, and relied on a pre-termination letter from the contracting officer to plaintiff. Various other memoranda, not by the contracting officer, were given to the contractor. Plaintiff apparently sought to answer any charge in any paper handed to it. The result was an abortion of the proper procedure under which the contracting officer should have informed the contractor as soon as possible of the reasons and grounds for the termination, not leaving them to speculation and uncertainty. In his discussion of "Anchoring of Metal Window Trim", the commissioner aptly says: "This entire matter well illustrates the confusion fairly arising from the ambiguous nature of the contracting officer's findings." In various parts of his opinion the commissioner points out the unclear and unspecific nature of many of the charges which the Board found to be sustained.

12. See Part I, *supra.* The commissioner notes the "Board's penchant for accepting unsupported rebuttal memorandum statements [the resident engineer] made after plaintiff's testimony was taken." One good example is included under the item "Flash Tank", in which, among other errors, the engineer's summary statement that he had "requested the contractor to correct the flash tank * * * many, many times" was accepted over Mr. Hedin's detailed oral testimony, not

treated as grounds for a default-termination actions of the contractor which did not relate to rejected materials or defective workmanship, or as to which no prior notice had been given, and which therefore could not fall under Clause 9.[13] A few of the items are absolutely trivial, calling for applications of the rule *de minimis*.

■ We do not pause to demonstrate *seriatim* all the errors and defects in the individual administrative determinations. They have been spelled out in detail by the commissioner. He concluded, and we concur: "An analysis of each one of the thirty-three alleged deficiencies which the Board upheld as constituting sufficient and independent bases for the termination shows that in no case can the Board's action be sustained. None of these alleged deficiencies constituted a proper basis for terminating the contractor's right to proceed under either Clause 5 or Clause 9(a) of the General Provisions of the contract." The Board, we think, failed to recognize that a default-termination is a drastic sanction (*see* Schlesinger v. United States, 390 F.2d 702, 709, 182 Ct.Cl. 571, 584 (1968)) which should be imposed (or sustained) only for good grounds and on solid evidence.

■ In the same vein, we point out that, even if we and the commissioner are wrong as to a few of the deficiencies, there is no reason to believe that the contracting officer would have imposed the severe penalty of default-termination for these scattered items alone. The Board considered some 114 alleged deficiencies, sustaining 33. If that number were now dropped, let us suppose, to five or seven,[14] it is very difficult to say that that small group would have been enough. The contracting officer had discretion whether or not to terminate (Schlesinger v. United States, *supra*, 390 F.2d at 707–708, 182 Ct.Cl. at 581), and we cannot bring ourselves to think that he would have ordered the work to a final halt because of a few deficiencies of the kind every construction contractor routinely experiences on every job.

## IV.

■ Since plaintiff was not in default on November 29, 1956, when the contracting officer issued the termination notice, we have to decide what the remedy shall be. Plaintiff is, of course, entitled to be liberated from the negative consequences of the default termination —the assessment of liquidated damages and comparable sanctions.[15] There is, in addition, the problem of what affirmative damages it may recover. Even where the contract contained a convenience-termination article, the court held that under the old-form contracts use of the default-termination device, where there was in fact no default, constituted a breach of the contract, permitting award of common-law damages. Klein

---

only was he never given notice, but that he was wholly unaware of the item. Often the Board gives no reason for preferring the conclusory written statements submitted by the procurement officials over the more specific oral testimony of plaintiff's witnesses.

13. The commissioner said: "The Board appears to have operated under the erroneous premise that any violation by the contractor of any provision of the contract or specifications is automatic warrant for termination action."

14. Defendant's brief to the court, on review of the commissioner's recommendation, discusses only 11 of the 33, but indicates that its position as to the remainder is preserved. Of the 11 items dis-

cussed, some are extremely unimportant (as are several of the remaining 22).

15. All the assessed liquidated damages should be returned because plaintiff was not in fact in default when the defendant defaulted it, and therefore the assessment was invalid on the ground on which it was placed. As the case comes to us, it is immaterial whether the imposition of liquidated damages at a later date (*e. g.*, during the spring of 1957) for unjustified delay at that time—if plaintiff had been allowed to continue on the job—would have been independently sustainable. No such assessment was made, and defendant has not counterclaimed on any such ground.

v. United States, 285 F.2d 778, 152 Ct.Cl. 8 (1961); Goldwasser v. United States, 325 F.2d 722, 725, 729, 163 Ct.Cl. 450, 457, 464 (1963); Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 96 n. 9, 167 Ct.Cl. 604, 609 n. 9 (1964); Dale Constr. Co. v. United States, 168 Ct.Cl. 692 (1964); Acme Process Equip. Co. v. United States, 347 F.2d 509, 530 n. 29, 171 Ct.Cl. 324, 360 n. 29 (1965), rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966); Coastal Cargo Co. v. United States, 351 F.2d 1004, 1007 n. 6, 173 Ct.Cl. 259, 264 n. 6 (1965); Schlesinger v. United States, supra, 390 F.2d at 710, 182 Ct.Cl. at 584–585.[16] This case is a fortiori because the contract had no convenience-termination clause and the default article did not refer to or incorporate in any way the former type of provision, or permit an improper default-termination to be turned into one for convenience (see Nolan Bros., Inc. v. United States, 405 F.2d 1250, 186 Ct.Cl. ——, —— (Jan. 1969). On the contrary Clause 5(c) flatly said that the "right of the Contractor to proceed shall not be terminated * * * because of any delays in the completion of the work due to unforeseeable causes * *." Under this provision, there would be no default at all if the delay was linked to "unforeseeable causes", etc. In these circumstances, the court has ruled that there is a breach of contract where a default-termination for alleged untimely performance fails to take into account time-extensions due the contractor for unforeseeable delays if such an extension would have taken the contractor out of default. Universal Power Corp. v. Unit-

ed States, 112 Ct.Cl. 97 (1948) (applying a substantially identical clause).

◼ The determination of the plaintiff's damages for this breach is a matter for the court. Unlike other default articles, this clause does not embody any provision for administrative computation of costs (or other recovery) if a default notice is wrongly issued.[17] The most that the Board could do, under this contract, would be to decide whether a time-extension was warranted or whether Clause 9 (relating to rejected materials and defective workmanship) had been violated by the contractor. If the contractor is found not to be in default, but has nevertheless been defaulted and evicted from the job, the Board can provide no affirmative monetary remedy. The case must therefore be treated—as Commissioner Gamer held—like an ordinary "breach" case in which damages (including anticipated profits, if properly proved) are to be shown in judicial proceedings. See Mauricio Hochschild, S. A. M. I. v. United States, 176 Ct.Cl. 808, 815 n. 2 (1966); Len Co. & Assoc. v. United States, 181 Ct.Cl. 29, 36, 53, 385 F.2d 438, 442, 452 (1967).

◼ In this connection, the commissioner ruled that plaintiff can still try (in court) some minor "breach" claims against the defendant which are not precluded by any Board finding entitled to finality.[18] We agree, with the caveat that these additional claims should be tried (or pursued) only if it seems probable that plaintiff's damages attributable to these particular claims (if they are vindicated) will increase its recovery beyond what it would otherwise obtain for

---

16. Contrast the line of cases beginning with John Reiner & Co. v. United States, 163 Ct.Cl. 381, 325 F.2d 438 (1963), cert. denied 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), governing invalid cancellations or terminations not for default, or where the contractor was in technical default but excusably so—in instances in which the agreement embodied a convenience-termination article.

17. As we have indicated, there was no convenience-termination article in the contract.

18. These minor "breach" claims are: (1) defendant's handling of the problem arising out of the unsuitable soil pocket in a dilatory manner, thereby causing such delay to plaintiff's operations as to amount to a breach of contract; (2) alleged refusal of the contracting officer to allow plaintiff to use foreign cement; (3) certain claims with respect to the shelf angles and bondstone matters.

the major breach of being put in default, when it was not in default. There is no use in trying these subsidiary demands if they will not add to plaintiff's damages but will merely duplicate the recovery on the main claim. *Cf.* Nolan Bros., Inc. v. United States, 405 F.2d 1250, 186 Ct.Cl. —— (Jan. 1969).

## V.

The commissioner found that, on the Board record, plaintiff was clearly entitled to a time-extension of 284 days, which would bring the completion date to April 8, 1957. (Forty-four days were accorded administratively on the shelf-angle and bondstone matters, and the commissioner found another 240 days covering the cement shortage and the soil condition together). In this one respect we differ from the commissioner. Though, as we point out in Part II, *supra*, the record does require a finding that the contractor should have had a time-extension for a substantial period after November 29, 1956 (the date of termination), we do not think that it compels us to hold that that period would be precisely 284 days—more particularly, 240 days for the cement shortage (and the soil condition). Plaintiff's evidence did result in that figure,[19] but the nature

of the Board hearing was such that we are not satisfied that the issue of the exact amount of the excusable delay was sufficiently ventilated by both sides or adequately presented. The defendant's primary argument was that the delay was not justifiable at all, and it had very little concern with the proper figure if its main contention was rejected. Since the length of the time-extension was peripheral, the plaintiff's offering on the point was not subjected to much testing or rebuttal, even for this peculiar type of proceeding. We are left with a nagging doubt that 240 days is the correct number.

We believe, in other words, that Hedin has conclusively shown that it was not in default on November 29, 1956 (and would not have been in default for some substantial time thereafter)[20] and should therefore not have to suffer the negative consequences of the default. But at the same time we are not, at this stage, at all certain as to plaintiff's right to an affirmative recovery of damages. We are not sure enough that plaintiff has shown that it was entitled to a time-extension to April 8, 1957, or that it could have completed the project on time, even with a proper extension,[21] or that in any

---

19. According to plaintiff's original progress schedule the concrete work actually accomplished by December 31, 1955, was only that planned to be reached by June 30, 1955—180 days earlier. These 180 days plaintiff attributes to the cement shortage (which began in May 1955) and to the unsuitable soil condition (for which it was granted only 30 days). Because of the delay in obtaining cement, concrete pouring (plaintiff's evidence indicated) had to continue through the 1955–1956 winter months, although the original plan had been to have the outside work completed before the winter of 1955–1956. In the contractor's view, work during the four winter months in the area of Marion, Indiana, is so difficult that it necessarily leads to a 50% delay. The result, plaintiff contends, is that it is entitled to an additional delay of 60 days (50% of four winter months), over and above the 180 days delay experienced up to December 31, 1955. The total comes to 240 days (plus the other 44 days administratively given).

20. It is part of this holding, and the record requires the finding, that plaintiff did not cause any substantial delays concurrent with that due to the cement shortage, the lowering of the footings, and the soil condition (the latter two being the reasons for the administrative grant of 74 days).

21. Up to the termination, both sides thought that plaintiff would finish the project by June 1957, a year after the original completion date of June 28, 1956. Commissioner Gamer says that "there was plenty of time for plaintiff, by the use of extra shifts or otherwise, to have accelerated the completion date to April 1957 if such were necessary to avoid a termination", but we think that further proof along this line would be helpful. After the termination, the contracting officer characterized the June 1957 date as an "impalpable prediction". We accept the trial commissioner's rejection of this *post litem motam* change-of-position as being without substantial support.

event its loss would have been less (if it finished) than it actually suffered. It may be that the correct time-extension is less than 240 days, and it is even conceivable that events after November 29, 1956 (for which a further extension would not be allowable) would have precluded timely completion.[22] These are, of course, merely queries on our part, not intimations that such were the real facts. But these questions emphasize that there should be adequate proof, presented in an adversary setting, as to the damages plaintiff actually suffered.

 In the interests of justice, we believe that the preferable solution is to leave to further trial proceedings in this court the issue of the length of the excusable delay, insofar as that question bears on plaintiff's damages. In showing its damages, plaintiff can prove that it was entitled to an additional 240 days (or some other number) and that this extension would have enabled it to close the job on time. The defendant, on the other hand, can seek to show that the proper extension was less and that in any event the contractor would not have been able to bring the project to a seasonable end.

Judicial proceedings on this issue (rather than a return to the Board) are appropriate because, as we have held (see Part IV, *supra*), this is now a "breach" case and the damages are to be determined in court. It is an integral and essential part of that judicial inquiry into damages to decide the length of the proper time-extension for excusable delay; the fact of injury and the monetary figure for that damage, if any, can hardly be found without knowing the span of the extension. In these special circumstances, we think that the rule of United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), is inapplicable. Both court and agency may have power to decide the length of the time-extension—the court, as part of the trial of damages for "breach"; the Board, under the disputes clause and the default-termination article—but the case has now to remain here in any event for the computation of damages and there is no reason to prefer, and good reason to subordinate, a determination by the agency of that single component of the recovery.[23]

## VI.

For these reasons, we hold:

(1) Plaintiff is entitled to recover the amount of $164,169.33, representing the total of the erroneous assessment of $155,400 for liquidated damages, plus the wrongful assessment of $8,769.33, for protection costs (which amounts were deducted in the final settlement payment made on the contract).

(2) There shall be proceedings, under Rule 47(c), for determination of the amount of plaintiff's other damages, if

22. If it turns out that plaintiff would have been unable to complete on time, that would not mean that the default-termination of November 29, 1956, would become retroactively valid. That particular action of the defendant must be tested as of the time and in the way it was taken. Bailey Specialized Buildings, Inc. v. United States, 404 F.2d 355, 362–363 186 Ct.Cl. ——, —— (Dec. 1968). As of that date (as we have held in this opinion), the default-termination was improper —and the defendant therefore breached the contract. The contracting officer could not, and did not, purport to forecast on November 29, 1956 that, because of problems thereafter appearing, plaintiff would be unexcusably delayed in December 1956 or in 1957. However, the absence of a default on November 29, 1956, does not automatically mean that plaintiff would have completed the job on time; and a failure to prove that it would have finished by the extended due date could well deprive the contractor of all or some affirmative damages for the breach.

23. If the issue of the time-extension were sent back to the Board the proceedings here on damages would have to be suspended meanwhile. After the Board's determination, there would presumably have to be court review of its findings. Then, at long last, the inquiry into damages, under our Rule 47(c), could begin. There would, in sum likely have to be two separate trials, one administrative and one judicial, an extra stage of judicial review, and much delay.

any, in accordance with this opinion (particularly Parts IV and V, supra).

(3) Plaintiff may proceed on its minor "breach" claims to the extent indicated in Part IV, supra.

(4) Plaintiff is not entitled to recover, and its petition is dismissed, with respect to (a) its claim for defendant's refusal to grant an equitable adjustment allowing a time-extension and reimbursement because of the need to construct footing forms, and (b) its claim as to the adequacy of the $4,797.08 allowed it as an equitable adjustment for the soil conditions necessitating the lowering of certain footings. See note 5, supra.

(5) Defendant's counterclaim for $240.17 (see note 2, supra) is dismissed.

(6) To the extent indicated, plaintiff is entitled to recover and its motion for summary judgment is granted. To the minor extent indicated in (4) supra, defendant's motion for summary judgment is granted and the petition dismissed.

Nichols and Davis, JJ., dissented.