ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Gerald R. Rouillard, III, d/b/a )  ASBCA No. 58459
   International Gear Technologies )
)
Under Contract No. SPM7MC-10-M-2339 )

APPEARANCE FOR THE APPELLANT:      Steven J. Boretos, Esq.
                                    Everett, WA

APPEARANCES FOR THE GOVERNMENT:    Daniel K. Poling, Esq.
                                    DLA Chief Trial Attorney
                                   Matthew O. Geary, Esq.
                                   Colleen T. Loughran, Esq.
                                    Trial Attorneys
                                    DLA Land and Maritime
                                    Columbus, OH

## OPINION BY ADMINISTRATIVE JUDGE PAUL ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

This is a timely appeal of a contracting officer's (CO's) final decision terminating appellant Gerald R. Rouillard, III, d/b/a International Gear Technologies' (IGT's) supply contract for default. The Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, is applicable. The government has filed a motion for summary judgment. IGT opposes the government's motion; it has not filed a cross-motion. We grant the motion.[1]

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On 8 December 2009, the Defense Supply Center, Columbus, Ohio (Maritime Supply Chain) (DSSC) issued request for quotations (RFQ) No. SPM7MC-10-0302 for the purchase of 445 spur gears, National Stock Number (NSN) 3020-00-888-0130 (R4, tab 87 at 4, 6). The RFQ included a procurement history for this NSN, dating back to 10 July 2007. As awarded, unit costs for the earlier contracts ranged from $106.00 to

---

[1] The government filed separate motions for summary judgment in ASBCA Nos. 58458 and 58459; however, appellant's opposition brief and the government's reply brief dealt jointly with the two appeals. Because the facts of each appeal differ, the Board is issuing separate decisions.

$210.95. (*Id.* at 2) The RFQ also contained a first article test (FAT) requirement which consisted of one additional unit (*id.* at 6).

2. The government's estimated unit price was $119.81. It received quotations with unit prices ranging from $110.25 to $490.00. IGT quoted a unit price of $110.25. The next two lowest offerors quoted unit prices of $111.00 and $112.70. (R4, tab 88)[2]

3. On 1 February 2010, DSSC awarded Contract No. SPM7MC-10-M-2339 to appellant for the supply of 317 spur gears at a unit price of $107.75 and $110.25 for 128 spur gears. Within 120 days, IGT was also required to submit a First Article (FA) at a unit price of $1,250. The total fixed-price contractual amount was $50,152.75. (R4, tab 1 at 1, 3, 5-6) As awarded, the FA unit was to be delivered 120 days after date of the order or by 1 June 2010, and the remaining spur gears were to be delivered by 6 June 2011 (*id.* at 5-6).

4. The contract contained FAR 52.209-4, FIRST ARTICLE APPROVAL— GOVERNMENT TESTING (SEP 1989). Also included in the contract were FAR 52.233-1, DISPUTES (JUL 2002); and FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE (APR 1984). (R4, tab 1 at 9, 11)

5. IGT did not deliver the FA by 1 June 2010 (R4, tabs 5-6). As of 20 October 2011, IGT still had not delivered the FA. On that date appellant notified the CO that it had "found an issue with the root diameter of the gear teeth on the first article part, we need to either request a waiver, or furnish another first article from a second lot we had started months ago." (R4, tab 44 at 4)

6. On 3 January 2012, the CO issued bilateral Modification No. P00003 to the contract. It established a new FA delivery date of 17 February 2012 and extended the delivery date for the 445 spur gears to 26 July 2012. (R4, tab 53) The modification also provided that failure of the FAT would result in termination of the contract for default (*id.*).

7. IGT did not deliver the FA by 17 February 2012. On 1 March 2012, appellant advised the CO that the FA unit had been completed (R4, tab 56 at 2). On 1 April 2012, IGT stated in an email to the CO: "When I get to my office tomorrow I will send you the FAT tracking info" (R4, tab 57). On 3 April 2012, appellant forwarded the promised information to the CO (R4, tab 58 at 1-2). On 10 April 2012, the CO stated that he had "checked the tracking and apparently they have not shipped yet" (R4, tab 59 at 2). On 12 April 2012, IGT stated: "I will be back in the office tomorrow to resolve FAT shipment, yes, we do have a large lot of parts waiting to ship once FAT is approved" (R4,

---

[2] In the "ABSTRACT OF QUOTES," appellant's bid was coded as "CAGE" "5HFP7" (R4, tab 88).

2

tab 60). As of 18 April 2012, the FA still had not been completed (R4, tab 61 at 3); and as of 3 May 2012, it had not been shipped (R4, tab 64 at 2-3).

8. On 14 June 2012, the FA unit was conditionally approved (R4, tab 67). On 20 June 2012, the CO forwarded the notice of conditional approval to IGT, noting six discrepancies. He also requested by attached letter that appellant inform him of a revised delivery date for "the production supplies" by 25 June 2012. (R4, tab 69 at 1, 3)

9. IGT did not comply with this request; and, on 26 June 2012, the CO again requested the delivery schedule by close of business on that day (R4, tab 71). On that same date, appellant responded that it would forward "a complete schedule" by 29 June 2012. He also stated: "I can tell you that we have separated 50 from a 160 piece lot and are expediting the 50 pieces for shipment asap." (R4, tab 72) On 28 June 2012, IGT advised the CO that it would ship 50 units "around July 20th" (R4, tab 76 at 1). On 9 July 2012, the CO, once again, requested a complete delivery schedule (R4, tab 77 at 1).

10. On 11 July 2012, Mr. Gerry Rouillard, III, IGT's president, forwarded a lengthy letter to the CO in which he alleged that as a result of various increased costs, its actual unit cost was $276.79, as opposed to the contractual prices of $107.75 and $110.25 (SOF ¶ 3). He also contended that, as a part of IGT's bid, he had relied on his father for "a large number of volunteer hours." Unfortunately, as a result of a heart condition, the elder Mr. Rouillard had been unable to work on the contract. Finally, IGT alleged that there had been a mutual mistake when it formulated its bid. Alleging that it had paid $1,680 for inspection of a single unit, appellant described the $1,500 payment to the government contained in a modification to another contract as an inspection fee, and concluded that it had grossly underestimated the actual costs of producing the spur gears. (R4, tab 78)

11. On 16 July 2012, the CO forwarded the following response to Mr. Rouillard:

> In response to your 7/11/12 request for a price increase on contract SPM7MC10M2399 for NSN number 3020-00-888-0130, your request is hereby denied.
>
> This is a firm fixed price contract. Your proposal in response to RFQ SPM7M10Q0302 offered a set unit price. The subject contract was awarded accordingly. You are obligated to perform to the terms of the contract.
>
> Within 5 calendar days from the date of this notice, you are requested to advise the undersigned in writing whether you will continue to perform the subject contract in accordance

3

> with the existing terms and conditions. Failure to respond by [sic] will lead to termination for default proceedings.
>
> The Government is not invoking its rights under FAR 52.249-8 - - Default (Fixed-Price Supply and Service), at this time. Please be advised, however, that notice of intention not to perform, or failure to perform, under the provisions of the contract may result in the subject contract being terminated for default, subject to the notice provisions of the default clause.
>
> Any assistance rendered to the contractor on this contract, or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as an intention on the part of the Government to condone any delinquencies or as a waiver of any rights the Government may have under the above contract.

(R4, tab 79) On 20 July 2012, IGT replied to the CO's letter. It stated that it would "continue to perform the subject contract in accordance with the existing terms and conditions." But appellant again sought a price increase based upon "clear and convincing evidence that a mutual mistake was made." (R4, tab 80 at 1-2)

12. IGT did not deliver the production lot of spur gears by the modified delivery date of 26 July 2012 (SOF ¶ 6; R4, tab 81). Accordingly, on 7 August 2012, the CO forwarded a show cause letter to appellant, in which he stated:

> You are hereby notified that the Government considers your Email dated 17 July, 2012 requesting an increase in unit price as unacceptable.
>
> Since you have failed to perform within the time required by the terms of your contract, the Government is considering terminating the contract under the provisions for default. Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose from causes beyond your control and without fault or negligence on your part. Accordingly, you are given the opportunity to present, in writing, any facts bearing on the question to the undersigned, within 10 days (August 17, 2012) after receipt of this notice. Your failure to present any explanations within this time may be considered as an

4

admission that none exist. Your attention is invited to the respective rights of the Contractor and the Government and the liabilities that may be invoked if a decision is made to terminate for default.

If it is your intention to perform under this contract, you should within 10 days (August 17, 2012) of your receipt of this letter, propose a new and reasonable delivery date by which the required supplies will be delivered together with monetary consideration for the additional performance time needed. Your proposed new delivery schedule will be taken into consideration by the Contracting Officer in deciding whether to terminate the contract.

The Government does not waive any rights it has by virtue of this letter and specifically reserves any and all rights it has relative to untimely delivery. Should your firm fail to propose a new delivery date, that failure will be considered as repudiation by your firm of its obligation to perform under this contract and the contract may be terminated for default.

Any assistance given to you on this contract or any acceptance by the Government of delinquent goods or services will be solely for the purpose of mitigating damages, and it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract.

(R4, tab 81)

13. IGT responded to the CO's show cause letter on 11 August 2012. It proposed a two-stage delivery schedule with units being delivered on 12 October 2012 and 19 March 2013. It also, once again referred to the illness of the elder Mr. Rouillard and contended that there had been a mutual mistake. (R4, tab 82) On 12 September 2012, the CO forwarded a letter to IGT in which he terminated the contract for default (R4, tab 84). This timely appeal followed (R4, tab 86).

## DECISION

A grant of summary judgment is appropriate when a review of the record demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a), (c)(1);

5

*Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The moving party has the burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes the requisite showing, then the burden shifts to the nonmoving party to show that there is a genuine factual issue for trial. *Id.* Moreover, the party opposing summary judgment—here the appellant—"must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." *Mingus,* 812 F.2d at 1390-91.

We are also guided by the settled law governing terminations for default. Such a termination is "a drastic sanction which should be imposed...only for good grounds and on solid evidence." *J.D. Hedin Construction Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969) (citation omitted). Accordingly, the government bears the burden of proving that the termination was reasonable and justified. If the government establishes a *prima facie* case in this regard, the burden of production—or going forward—shifts to the contractor. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987).

Initially, we simply note that appellant did not file a "Statement of Genuine Issues of Material Fact" which would have aided us in succinctly identifying any genuine factual disputes. Instead, it opposed respondent's motion in a diffuse manner with few or no citations to the evidentiary record. What is undisputed is that appellant failed to deliver any production lots on or before the revised delivery date of 26 July 2012 (SOF ¶ 12). Therefore, the government has established a *prima facie* case, and the burden of going forward shifts to appellant to demonstrate that its failure to deliver was excusable.

Appellant relies heavily on the argument that the purported illness of its president's father, Mr. Gerald Rouillard, Jr., severely impacted its ability to perform. Although appellant provides little or no evidence to support its underlying contentions, we will accept for purposes of this motion that Mr. Rouillard suffered a serious illness at the time of contractual performance. As a legal matter, this Board has promulgated a host of cases which hold that, absent an understanding by both parties that a key person would be responsible for performance, his or her illness or death would not excuse a default. *See, e.g., M.W. Microwave Corp.*, ASBCA No. 45084, 93-3 BCA ¶ 26,027 at 129,377-78; *Jonatech, Inc.*, ASBCA No. 46088, 94-3 BCA ¶ 27,248 at 135,774; *Brill Brothers, Inc.*, ASBCA No. 42573, 94-1 BCA ¶ 26,352 at 131,056; *M&T Construction Co.*, ASBCA No. 42750, 93-1 BCA ¶ 25,223 at 125,636. No such understanding has been shown here. Thus, appellant's arguments in this regard are unavailing.

Appellant also contends that it should be granted relief from the default termination because of an alleged mistake in bid. During contractual performance,

IGT contended, without any support in the evidentiary record, that its inspection cost for a single unit was $1,680. It also argued that the $1,500 fee stated in Modification No. P00001 of a related contract—but not in this contract—was the government's inspection cost and reasoned from this premise that its bid grossly underestimated the cost of producing the spur gears and resulted in a mutual mistake in bid. Appellant's argument is illogical and does not advance its case. We find no evidence of mistake in bid, unilateral or bilateral.[3]

Finally, appellant makes the belated contention that it made a unilateral mistake in bid when it relied upon the procurement history for the spur gears which was contained in the solicitation. This argument is difficult to comprehend. The procurement history cited by appellant merely sets forth unit costs for earlier contracts dating back to 10 July 2007 and ranging between $106.00 and $210.95 (SOF ¶ 1). Appellant's bid of $107.75 per unit for one quantity and $110.25 per unit for the remainder fit well within this range. It also closely tracked the government's estimate of $119.81. (SOF ¶ 2)

In order to establish a defense against a default termination based upon a unilateral mistake in bid, appellant must demonstrate by clear and convincing evidence that:

> (1) [A] mistake in fact occurred prior to contract award;
> (2) the mistake was a clear-cut, clerical or mathematical error or a misreading of the specifications and not a judgmental error; (3) prior to award the Government knew, or should have known, that a mistake had been made and, therefore, should have requested bid verification; (4) the Government did not request bid verification or its request for bid verification was inadequate; and (5) proof of the intended bid is established.

*McClure Electrical Constructors, Inc. v. Dalton*, 132 F.3d 709, 711 (Fed. Cir. 1997) (citing *Solar Foam Insulation*, ASBCA No. 46921, 94-2 BCA ¶ 26,901). Even though appellant's contention that it somehow relied on the procurement history in formulating a mistaken bid is not supported by record evidence, we shall assume, for purposes of the motion, that "a mistake in fact occurred prior to contract award." Nevertheless, appellant has not satisfied, by clear and convincing evidence, the other four prongs of the test. For example, IGT has not demonstrated or alleged either that it made a clear-cut, clerical or mathematical error or misread the specifications. In fact, its bid was in line both with the procurement history and the government's estimate.

---

[3] Appellant did not include this argument in its opposition brief and may have abandoned it (app. br., *passim*).

In addition, the CO could not have been placed on notice by appellant's bid that there had been a mistake: there was simply no disparity between it, the procurement history, and the government's estimate. Under these circumstances, IGT's contentions must fail.

## CONCLUSION

We find no genuine disputes as to material facts and that the government is entitled to judgment as a matter of law. The government's motion for summary judgment is granted. The appeal is denied.

Dated: 8 October 2014

MICHAEL T. PAUL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58459, Appeal of Gerald R. Rouillard, III, d/b/a International Gear Technologies, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

8