ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --          )
                          )
Ballistic Recovery Systems, Inc.    )      ASBCA No. 61333
                          )
Under Contract No. SPE4A7-16-C-0218   )

APPEARANCES FOR THE APPELLANT:      Mr. Enrique Dillon
                                            Director/President
                                            Mr. Todd J. Biederman
                                            Defense Contracts Manager

APPEARANCES FOR THE GOVERNMENT:     Daniel K. Poling, Esq.
                                              DLA Chief Trial Attorney
                                              Edward R. Murray, Esq.
                                              Trial Attorney
                                              DLA Aviation
                                              Richmond, VA

## OPINION BY ADMINISTRATIVE JUDGE PAUL ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

This is a timely appeal of a contracting officer's (CO's) final decision terminating appellant, Ballistic Recovery Systems, Inc.'s (BRSI's), supply contract for default. The Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109, is applicable. The government filed a motion for summary judgment, BRSI submitted an opposition document and the government filed a reply.

### STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

1. On March 25, 2016, the parties entered into fixed-price Contract No. SPE4A7-16-C-0218 (the contract) for the supply of 1,667 deployment sleeves at a total contractual amount of $221,962 (R4, tab 1 at 1).[1]

2. The deployment sleeves were an integral part of "the T-11 Personal Parachute System, a personal parachute used by the United States Army for mass insertion" (gov't mot., Koven decl. ¶ 2). The parachute system comprised "the main canopy, the deployment sleeve [at issue here],...a smaller canopy called the drogue

---

[1] The contract incorporated Solicitation No. SPE4A7-16-R-1504 (R4, tab 5), as well as BRSI's bid (R4, tab 1 at 1, tab 7 at 3).

chute,...a bridle line that connects the deployment sleeve to the main canopy,...as well as several other components" (*id.*, ¶ 3).

3. According to the sworn declaration of Ms. Jennifer Koven, a textile technologist with the Army's Aerial Delivery Engineering Support Team:

> Unlike a freefall parachute, where the parachutist pulls a rip cord to initiate the deployment sequence, the T-11 is attached to the aircraft by a static line. The parachute thus begins to deploy shortly after the parachutist exits the aircraft and the static line reaches full tension. The deployment sleeve extracts from the deployment bag and the drogue chute inflates at the top end of the deployment sleeve. The drag created by the drogue chute causes the deployment sleeve to elongate, thereby removing the main canopy from the deployment sleeve in proper elongated fashion. The canopy, which is attached to the deployment sleeve by the bridle line, then begins to inflate. Once the canopy is approximately one-half to two-thirds inflated, the drogue chute loses its air resistance and deflates. The deployment sleeve and drogue chute then come to rest on the top of the canopy. The T-11 Personnel Parachute System is reusable. Thus, after landing and recovery the system is inspected and repacked for another use.

(Gov't mot., Koven decl. ¶ 4) (Citations omitted)

4. The contract incorporated by reference the following, pertinent Federal Acquisition Regulation (FAR) clauses: FAR 52.246-2, INSPECTION OF SUPPLIES—FIXED-PRICE (AUG 1996); FAR 52.246-16, RESPONSIBILITY FOR SUPPLIES (APR 1984); and FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE (APR 1984) (R4, tab 1 at 10, 12). It also included FAR 52.209-4, FIRST ARTICLE APPROVAL—GOVERNMENT TESTING (SEP 1989) clause, which provided:

> (a) The Contractor shall deliver 2 each=1 test unit(s) of Lot/Item 1670-01-567-2211 within [85] calendar days from the date of this contract to the Government at [The US Army Research Development and Engineering Center, Natick, Massachusetts (ADEST)] for first article tests. The shipping documentation shall contain this contract number and the Lot/Item identification. The characteristics that the first article must meet and the testing requirements are specified elsewhere in this contract.

(b) Within 35 calendar days after the Government receives the first article, the Contracting Officer shall notify the Contractor, in writing, of the conditional approval, approval, or disapproval of the first article. The notice of conditional approval or approval shall not relieve the Contractor from complying with all requirements of the specifications and all other terms and conditions of this contract. A notice of conditional approval shall state any further action required of the Contractor. A notice of disapproval shall cite reasons for the disapproval.

(R4, tab 5 at 20) Finally, the contract contained Defense Logistics Acquisition Directive (DLAD) clause, 52.209-9018, FIRST ARTICLE – GOVERNMENT TEST – ADDITIONAL REQUIREMENTS (AUG 2014), which stated, in pertinent part:

(a) For the lots/items identified in this contract as requiring Government first article test (FAT) in accordance with the clause at Federal Acquisition Regulation (FAR) 52.209-4, the Contractor shall—
(1) Conform with technical requirements stated and/or referenced in the solicitation; including number of units to be produced, data required, performance or other characteristics that the first articles shall meet, sequence of processes, tests to which the first articles shall be subjected, and conformance criteria for each requirement specified.
(2) Provide all facilities, equipment and personnel required to perform the examination and evaluation of the first article units when first article testing will be conducted at the Contractor's plant. The Government reserves the right to charge the Contractor for any additional costs of examination and evaluation caused by failure of the Contractor to make available the first article units or the required facilities, equipment or personnel, at the times specified in the above mentioned notice to the Contracting Officer.

(*Id.*)

5. The contract required that BRSI submit two deployment sleeves for a first article test (FAT). Prior to award, BRSI had requested a FAT waiver based upon its earlier contract with the Defense Logistics Agency (DLA) for the same item, Contract No. SPE4A7-13-C-0274 (contract 0274). (R4, tab 7 at 22, 24, 32) The waiver request

3

was denied by the government (R4, tab 6). Its rationale was that no inspections had been performed on the deployment sleeves for almost two years (R4, tab 8).

6. On September 21, 2016, BRSI submitted to ADEST two units for FAT (R4, tab 16 at 1). Ms. Koven of ADEST conducted the FAT and reported the following conclusions:

> I found numerous major deficiencies in my review of BRS's first article submission. The sleeves included improperly formed bartacks and both samples had bridle loops longer than dimensional tolerance. There were also multiple instances of stitching outside dimension tolerances, multiple instances of hook tape and loop tape not fully captured by stitching, multiple instances of stow panel not captured by stitching, leftover stitching and damaged webbing from bartack removal, dimensional noncompliances on the stow flap assembly, and multiple birdnests (tangled mass of thread resembling a bird's nest), knots, stitch loops, and leftover stitches. Any one of these nonconformities alone would be sufficient to reject a first article, as one major defect, as identified in MIL-STD-849, will trigger rejection of a first article. I recommended disapproval to DLA for this first article submission.

> We were concerned about the numerous deficiencies on the first article samples provided by BRS. Sample 1 was disassembled during first article testing, but FAT Sample 2 was left intact. Accordingly, on October 19, 2016, we performed a drop test from an aircraft on BRS FAT Sample 2. I have attached screen captures from video taken during the drop test as Exhibit G. During testing, the drogue chute inflated, the deployment sleeve elongated normally, and the main canopy separated from the sleeve. However, when the bridle line reached full tension, failure occurred at the bridle line attachment loop sewn into the deployment sleeve. This disconnected the drogue chute and the deployment sleeve from the canopy. Without the resistance from the drogue chute, the canopy shape became distorted, causing it to inflate asymmetrically. At the time of attachment loop failure, the bridle line is under tension. When the bridle attachment loop failed, this caused the bridle line with connector link hardware to recoil toward the canopy. In this case, the damage suggests that the

4

bridle line entangled with the cotton webbing sewn around the bottom opening of the deployment sleeve, tearing the webbing off the sleeve. After this separation, the bridle was allowed to whip around throughout the rest of the canopy deployment. Fortunately, the bridle line did not become entangled with the canopy and the canopy was able to correct itself and inflate normally....

This drop test demonstrated three significant failure scenarios. The first, which is demonstrated by the condition of the deployment sleeve, is that the deployment sleeve was destroyed and was unsuitable for reuse. As mentioned above, these are supposed to be reusable sleeves. Second, as demonstrated by the pictures of the canopy deploying, the detachment of the bridle line releases the tension at the top of the canopy which disrupts the air channel and elongation phase of the canopy. Therefore the canopy does not fill properly, resulting in a slower opening and in an irregular manner. This could affect the rate of descent and reduce the time allowed for a safe jump. Given that the T-11 parachute is cleared for use at altitudes as low as 560 feet, this has potential to create significant bodily harm to the parachutist. Finally, the worst case scenario would be that the detached bridle line becomes entangled around the main canopy and prevents it from opening. Although that did not happen here, the pictures of the bridle line (with metal hardware) whipping around the canopy demonstrate the potential for such a failure. This could be catastrophic.

My analysis of the cause of the failure, which was developed with the assistance of my colleagues at ADEST, is that the bridle attachment loop tore out of the deployment sleeve because it was not fully seated in the seam (not fully inserted and/or sewn into the seam) and therefore not fully captured by the bartack and reinforcement stitching. This was likely also the reason why the bridle attachment loops measured longer than allowed for the first article samples, *i.e.*, they measured long because they were not fully seated in the seam. I

5

recognized a poorly formed bartack as a deficiency in the
first article sample provided by BRS.

(Gov't mot., Koven decl. ¶¶ 6-9) (Citations omitted)

7. On October 6, 2016, as a result of Ms. Koven's extensive testing, ADEST rejected BRSI's FAT (R4, tab 16). Pursuant to FAR 52.209-4(c), ADEST offered BRSI the opportunity to resubmit two FAT samples (R4, tab 17). Accordingly, BRSI submitted two revised FAT articles which were received by ADEST on October 26, 2016 (R4, tabs 18-19).

8. Ms. Koven tested the resubmitted FAT samples and concluded that they were nonconforming as a result of major deficiencies. In her sworn declaration, she stated, in pertinent part:

> The FAT resubmission samples once again contained numerous major deficiencies. I discovered another bartack not fully formed with stitches pulling out, two rows of reinforcement stitching where three are required at the point where the bridle attachment loop is secured to the deployment sleeve, multiple instances of misalignment of bartack to flap edge, loop tape not fully captured by stitching, multiple instances of improper seam folds, a location where the stitching did not extend full length of seam, improper tape fold lengths, multiple instances of material dimensions out of tolerance, a stow panel not stitched in prior to the top flap, holes and other defects in the cloth, and knots in the stitching, missing stitching, and skipped stitching. Again, any one of these deficiencies on its own would be sufficient to disapprove the first article. However, given the failure of the bridle attachment loop in the test drop, I was particularly concerned about one deficiency. Deficiency 23 was a failure to include the correct number of rows of reinforcement stitching where the drogue loop and bridle attachment loop are sewn to the deployment sleeve. The drawing called for three rows of reinforcement stitching (3 double rows of stitching around the bartack, which is 3 rows above and 3 rows below the bartack), in addition to the stitching already present which sews the seam along the top edge of the seam, but BRS had only used two. This deficiency could lead to the same type of failure experienced on the test drop. I accordingly

6

recommended disapproval to DLA for this article resubmission.

(Gov't mot., Koven decl. ¶ 11) (Citations omitted) Accordingly, on November 22, 2016, BRSI's FAT resubmission was rejected (R4, tab 19).

9. On April 10, 2017, the government issued to BRSI a show cause notice so that it could state "any excusable causes of defect, that you believe, caused your firm's first article test and textile and material test failures." The government gave BRSI 10 days to respond to this notice and stated that it was considering terminating the contract for default. (R4, tab 26)

10. In its response to the show cause letter, dated April 14, 2017, BRSI did not address in any detail the major deficiencies cited by ADEST in the reports rejecting the FAT samples. Instead, it referred to an earlier contract (0274) in which its FAT samples for the deployment sleeves had been approved several years earlier and argued that this constituted a "production standard" for the instant contract. (R4, tab 27 at 2-4) In formulating this argument, BRSI ignored the fact that the CO had earlier denied its FAT waiver request based upon its success with the FAT in contract 0274 (SOF ¶ 5). Also, contrary to BRSI's assertions, the CO had informed it that the FAT approval letter was not a "manufacturing standard," and did not constitute authority to deviate from the contract with regard to production items (R4, tab 25 at 11; SOF ¶ 4).

11. On June 23, 2017, the CO issued contract Modification No. P00003, terminating the contract for default "as a result of multiple first article test disapprovals under the contract which failed to conform to the technical data packages" (R4, tab 4 at 1-2).

12. This appeal followed.

## DECISION

In conjunction with its answer, respondent filed a motion for summary judgment supported by a sworn affidavit. BRSI, appearing, *pro se*, did not file a cross-motion. In fact, it did not file an opposition brief, denominated as such. Instead, it merely submitted a "Statement of Genuine Issues of Material Fact" which tracked a portion of respondent's filing. Respondent subsequently, filed a reply brief, again supported by a sworn declaration.

A grant of summary judgment is appropriate when a review of the record demonstrates that there is no genuine dispute as to any material fact and the moving party

7

is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a)(c)(1);[2] *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The moving party has the burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes the requisite showing, then the burden shifts to the non-moving party to show that there is a genuine factual issue for trial. *Celotex*, 477 U.S. at 322. Moreover, the party opposing summary judgment – here the appellant – "must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." *Mingus*, 812 F.2d at 1390-91; *Gerald R. Rouillard, III, d/b/a International Gear Technologies*, ASBCA No. 58459, 14-1 BCA ¶ 35,766 at 174,995.

We are also guided by the settled law governing terminations for default. Such a termination is "a drastic sanction which should be imposed...only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431, (Ct. Cl. 1969) (citation omitted). Accordingly, the government bears the burden of proving that the termination was reasonable and justified. If the government establishes a *prima facie* case in this regard, the burden of production – or going forward – shifts to the contractor. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *Rouillard*, 14-1 BCA ¶ 35,766 at 174,995. FAT failures with "critical and major defects" that are not easily correctable and which the contractor does not attempt to correct constitute a reasonable basis for a default termination. *American Ballistics Co.*, ASBCA No. 38578, 92-3 BCA ¶ 25,056 at 124,874.

Here, the government, through two extensive briefs supported by detailed, sworn affidavits, has established a *prima facie* case demonstrating that the default termination was reasonable and justified. With respect to the first FAT samples, Ms. Koven's sworn affidavit describes numerous major deficiencies. In addition, the drop test performed by the government "demonstrated three significant failure scenarios." (SOF ¶ 6) Similarly, as described by Ms. Koven, the "FAT resubmission samples once again contained numerous major deficiencies" (SOF ¶ 8). Accordingly, like the first FAT samples, they were rejected.

Viewed through the totality of its submissions, appellant has not met its burden of production. In its response to the government's show cause notice, BRSI did not address in any detail the major deficiencies cited by ADEST in the reports rejecting its FAT samples. Instead, it referred to its earlier contract 0274, in which its FAT samples for the deployment sleeves had been approved several years earlier. (SOF ¶ 10) Moreover, in its complaint, appellant admitted that its FAT samples under the instant contract "were non-conforming products." In addition, BRSI admits in its complaint that it "manufactured deficient items." (Compl. at 1-2)

---

[2] Board Rule 7(c)(2) provides that the Board looks to Federal Rules of Civil Procedure 56 for guidance in addressing motions for summary judgment.

In addition, in paragraph 17 of the "Statement of Undisputed Facts" which accompanied its summary judgment motion, respondent alluded to the major deficiencies cited in its reports and concluded that "[a]ny one of these nonconformities on its own would be sufficient to constitute a first article failure." In its response, BRSI stated "Admit" to this paragraph (app. opp'n at 2). It thus, effectively concedes the government's case.

We have carefully reviewed appellant's other assertions and reject them.

<u>CONCLUSION</u>

We grant the summary judgment motion and deny the appeal.

Dated: December 13, 2018

MICHAEL T. PAUL
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61333, Appeal of Ballistic Recovery Systems, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals