# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
)
Pyrotechnic Specialties, Inc. )    ASBCA Nos. 57890, 58335, 59103
)
Under Contract No. W52P1J-04-C-0098 )

APPEARANCES FOR THE APPELLANT:        M. Devlin Cooper, Esq.
                                       Kenneth E. Barton III, Esq.
                                         Cooper, Barton & Cooper
                                         Macon, GA

APPEARANCES FOR THE GOVERNMENT:        Raymond M. Saunders, Esq.
                                         Army Chief Trial Attorney
                                       Robert B. Neill, Esq.
                                       Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE PAGE
## ON APPELLANT'S MOTION FOR RECONSIDERATION

Appellant Pyrotechnic Specialties, Inc. (PSI, contractor or appellant), timely moved for reconsideration of the Board's decision in *Pyrotechnic Specialties, Inc.*, ASBCA Nos. 57890, 58335, 59103, 17-1 BCA ¶ 36,696[1]; the government (Army or the government) opposes the motion. That decision upheld the government's termination for default of the underlying contract, its rejection of Lot 3-3A, and the government's entitlement to recovery. Familiarity with that decision, which addressed entitlement only, is presumed. We deny the motion.

*1. Standard for Deciding Motions for Reconsideration*

We adhere to a familiar standard in evaluating these motions. Reconsideration "is not the place to present arguments previously made and rejected. '[W]here litigants have once battled for the Court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,146 at 180,840-41. These motions "do not afford litigants the opportunity to take a 'second bite at the apple' or to advance arguments that properly should have been presented in an earlier proceeding.' *Id.* (quoting *Dixon v. Shinseki*, 741 F.3d 1367, 1378 (Fed. Cir. 2014) (citations omitted); *see also Avant Assessment, LLC,* ASBCA No. 58867, 15-1 BCA ¶ 36,137 at 176,384. Having said that:

---

[1] Further references to the decision are to volume and page number, *e.g.*, "17-1 at 178,700."

[I]f we have made mistakes in the findings of fact or conclusions of law, or by failing to consider an appropriate matter, reconsideration may be appropriate. *See Robinson Quality Constructors*, ASBCA No. 55784, 09-2 BCA ¶ 34,171 at 168,911; *L&C Europa Contracting Co.*, ASBCA No. 52617, 04-2 BCA ¶ 32,708. In short, if we have made a genuine oversight that affects the outcome of the appeal, we will remedy it.

*Relyant*, 18-1 BCA ¶ 37,146 at 180,840-41.

## 2. *Background*

The facts of these appeals, which are lengthy and technical, involve PSI's production (with varying degrees of success) of multiple lots of signal flares. Some background is useful. Firm-fixed-price Contract No. W52P1J-04-C-0098 with the Army called for PSI to manufacture and provide "MK 124 Mod 0 Signal, Smoke and Illumination" (MK 124, signal flare, device, or unit). The purpose of the device was to produce a visible distress signal to allow military personnel to summon the attention of reconnaissance aircraft. 17-1 at 178,661, findings 1, 2. The four stages of production were called "Interfixes" 1, 2, 3, and 4; lots within each were serially identified as Lot 1-1, Lot 1-2, etc. 17-1 at 178,669.

The MK 124 is a cylindrical canister about five inches long and 1.7 inches in diameter. Each end of the MK 124 is crimped to ensure stability. 17-1 at 178,663, findings 10, 12, 14. Among contract requirements in the Technical Data Package is Drawing 3139733, which identifies additional required characteristics of the MK 124. Note 10 of the drawing provides in relevant part that "[a]fter crimping, [both igniters] shall not be damaged and shall be capable of withstanding a torque of 20 inch-pounds min[imum] with [the outer container] without relative movement [commonly referred to as 'no relative movement]." This note is preceded by the indicator "(M103)," which "identif[ies] it as a Major characteristic" that is important to the integrity of the signal. 17-1 at 178,668, finding 28. The contract was terminated for default after PSI repeatedly had problems timely and successfully producing lots acceptable to the government. 17-1 at 178,687-90, findings 168-77.

## 3. *PSI's Arguments in Support of Its Motion for Reconsideration*

PSI asserts that "[c]ritically, there are three key reasons that the Board's decision is in error and should be reconsidered." These are that the "testimony at the hearing does not support the factual findings of the Board's Order"; the "Board ultimately and

2

improperly shifted the burden of proof to PSI"; and, the "Board should reconsider its decision and allow PSI to present the full evidence in its possession of the Government's bad faith." (Appellant's Brief in Support of its Motion for Reconsideration (app. br.) at 2) Examples given by PSI in which hearing testimony allegedly does not support the decision concern the torque test; PSI's crimping problems; and trigger assembly separation defects. It also asserts that the CO mistakenly cited the number of flares from Lot 4-1 with excessive smoke times. (*Id.* at 2-8)

### a. Appellant's Allegations Concerning the Torque Test

The contract required PSI to demonstrate that there was "no relative movement" of the ends of the device as part of inspection. While the contract did not specify a particular means to verify this, appellant internally developed the torque test, which involved twisting canister ends using a torque wrench, as a measurement. The government then allowed this to be used in acceptance testing. *See, e.g*, 17-1 at 178,674-79, findings 84-116. The protocol for PSI's rework of Lot 3-3 as Lot 3-3A included "100% torque [testing] of the units." 17-1 at 178,674, finding 84. Also at that time, the government had the contractor begin to draw a vertical line on the end of the canister to more easily detect whether there was movement when torqued. *See* 17-1 at 178,679, findings 114-16.

While the decision evaluated and rejected this argument (*see, e.g.,* 17-1 at 178,693-96), PSI maintains on reconsideration that the decision is based upon erroneous findings of fact concerning the torque test which led the Board to the wrong legal conclusion. With respect to finding 90, appellant contends that the government reviewed and approved this test prior to the rework of previously-rejected Lot 3-3. Next, it contends that findings 97 and 116 are inconsistent regarding whether the government had reservations about the efficacy of the torque test. Third, appellant asserts that the government's specifications are defective because PSI manufactured the MK 124s properly and thus its inability to pass inspection was the result of flawed testing. (*See* app. br. at 2-5, *also* app. post-hearing br. at 9-12)

### 1. Finding 90

Finding 90 reads in relevant part: "However, there is no evidence that the torque test was reviewed or approved by the government *at any time prior to Lot 3-3's rework.* The record does not include a proposed or approved quality management plan or [Acceptance Inspection Equipment] AIE submission, and no government witness could remember the torque test being submitted for approval." 17-1 at 178,675 (emphasis added, footnote omitted). Appellant maintains that "this conclusion is directly in contradiction to the evidence presented at trial," as testimony from CO Pierce shows

3

that he "eventually acknowledged" that "the Relative Movement Torque Test was approved as the AIE submission" (app. br. at 2-4 (citing tr. 4/113-14)).

When his testimony is read in full, CO Pierce responded "I don't recall" when asked whether the contractor had "an approved AIE plan for this contract" (tr. 4/113). Although he answered affirmatively to another question regarding whether PSI had been "conducting torque testing in accordance with a plan from [the] Rock Island [District]" (tr. 4/113-14), this falls short of establishing that the torque test was made part of the AIE or that this occurred prior to the reworking of Lot 3-3 as Lot 3-3A. CO Pierce further testified that this reference to the Rock Island plan pertained to the "[b]eginning of [Lot] four" (tr. 4/114), which took place after the rework of Lot 3-3. *See* 17-1 at 178,674-87, findings 81-167.

PSI also attempts to buttress its allegation that the torque test "was the approved testing procedure" with testimony from Mr. Cowart, one of the government's quality assurance representatives. As noted in finding 116, Mr. Cowart "testified that the government did not have a problem with the PSI torque test to assess the crimping process until the trigger assemblies started separating (tr. 4/10)." (App. br. at 2-4) We do not agree that Mr. Cowart's testimony supports appellant's contention.

The testimonies from CO Pierce and Mr. Cowart are inadequate to establish that the torque test was part of the AIE, especially prior to the rework of Lot 3-3. *See, e.g.*, 17-1 at 178,675, finding 92 ("The first time a torque test was performed during a LAT was during the modified LAT for Lot 3-3A."), and finding 89 ("The torque test was not one of the tests required by Specification 13697N" but was developed "by PSI as part of its own quality inspections."). Finding 84 acknowledged that PSI was allowed to use the torque test in evaluating the reworking of Lot 3-3 and in later lots. *See, e.g.*, 17-1 at 178,674-75, findings 84-90. While the government told PSI "to update its AIE after the torque test procedure was revised during Interfix 4," appellant cites nothing else in the record to support that it did so prior to Lot 3-3 or that the torque test was made part of the AIE. 17-1 at 178,707 n.17.

### 2. *Findings 97 and 116*

PSI next asserts that findings 97 and 116 of the decision are "internally…inconsistent" regarding whether the government had concerns over the contractor's use of the torque test to assess whether there was relative movement at the canister's ends (app. br. at 4). Finding 97 notes Mr. Bowen's testimony that the government was concerned over whether "PSI's torque test would be able to show a gross failure of the contract requirement that there be no 'relative movement' between the trigger assembly and the outer container" because "there was no datum collected to verify the absence of movement." 17-1 at 178,676-77, finding 97. In finding 116, and as discussed above, Mr. Cowart's testimony

4

at transcript 4/10 is consistent with the government's allowing PSI to use the torque test until trigger assemblies began falling off during testing of Lot 3-3A. 17-1 at 178,679, finding 116.

If it is appellant's point that findings 97 and 116 are in conflict and this error warrants reconsideration, we disagree. These relate to different stages of production, and reflect the government's increasing concerns over PSI's inability to consistently make MK 124s in accordance with the contract. The government allowed PSI to use the torque test until trigger separation failures brought into question the effectiveness of this test to detect relative movement. Once more, the testimony appellant relies upon from CO Pierce and Mr. Cowart is unpersuasive; these witnesses simply did not go so far as PSI would have us find. As noted in finding 89, the decision acknowledges that the torque test previously had been used internally by PSI and that Mr. Cowart was aware of this, but appellant furnishes no proof that the test was made part of the contract or AIE prior to Lot 3-3A, or that passing it guaranteed a unit's acceptance. 17-1 at 178,675, finding 89, *see also* findings 90-92.

### b. *Appellant's Allegations of Factual Error in the Contracting Officer's Final Decision (COFD)*

PSI asserts that finding 176, which "quotes from the CO's final determination of 26 September 2011, terminating the contract for default," is in error. Appellant observes that the COFD states that "'While it is true that Lot 1 was accepted on deviation for ONE long display time on the smoke end of the signal, that was the extent of the quality problems in that Lot.'" According to PSI, the "CO was incorrect" as "Lot 1 was accepted on deviation with 7 long display times, as admitted by PSI. That is in the record, and why a contractor would admit to more unacceptable display times than necessary remains unanswered by the Government." (App. br. at 4-5)

PSI is correct that there were seven signals in Lot 1 that exhibited this flaw (app. br. at 4-5), as acknowledged elsewhere in the decision. *See* 17-1 at 178,684, finding 146. If PSI's argument regarding finding 176 is that the Board erred, then it has not proven its case as the record shows that the Board correctly quoted the COFD, even if the CO should have indicated that there were seven long smoke times and not just one. *Compare* 17-1 at 178,684 and 178,689-90, findings 146 and 176. This minor mistake by the CO does not form a basis for reconsideration or a need to revise the decision, particularly in light of the serious shortcomings on the part of PSI that justified default termination.

5

### c. *Appellant's Allegations Concerning Crimping*

PSI criticizes two statements by the Board that deal with crimping the canisters. First, it quotes from the decision that "'appellant has failed to carry its burden of proving that its crimps were proper and were not the cause of the failure'" (app. br. at 5 (citing 17-1 at 178,695)). Appellant asserts that "the critical defect with Lot 3-3 was poor crimping, allowing the igniter to separate from the canister and shoot downrange in one instance. As a result, the entire lot was re-crimped, and Lot 3-3A was then audited very closely by the Government, which watched over all of the re-crimping and gave permission for that re-crimping." (App. br. at 5)

Although not clearly articulated by PSI, we understand it to assert that government monitoring of the re-crimping process is proof that the crimping was done properly or perhaps that the government somehow became responsible for the work. Regrettably for PSI's purposes, it does not furnish a cite to the record for the proposition that the government closely "audited" the re-crimping of Lot 3-3. Nor does it prove that the re-crimping was properly done, or that any government oversight relieves appellant of its burden of proof to show the default was improper.

The second statement that PSI takes exception to relates to the contract's "no relative movement" requirement. It quotes from the decision: "[n]o evidence was presented about the efficacy of the torque test to prove proper crimps for both purposes, and the record raises serious questions about the torque test's ability to demonstrate that a MK 124 is crimped sufficiently to hermetically seal the signal." (App. br. at 5 (quoting 17-1 at 178,695))

According to PSI, the decision errs because "after Lot 3-3A, DC[M]A introduced the Vertical Line Test. Until then, the Torque Test was the approved check for Relative Movement, as acknowledged by [CO] Pierce in the testimony…. In fact, he explains the development of that process perfectly." PSI also alleges that: "There was never a dispute as to how to test for Relative Movement, and Torque Testing was approved by [the] AIE. So, if the test was not working properly and it was annotated on the plan sheet as testified to by Mr. Pierce, then, in fact, PSI proved that there were, in fact, defective specifications provided for the MK 124 by the Government." (App. br. at 5) As we understand PSI, its argument is predicated on the torque test having been made part of the AIE; this is rejected in section 3.a above. It is unclear how appellant urges this quote to evidence factual error on the part of the Board, nor does PSI adequately explain how the added use of a "vertical" or "reference" line proves its point. In the decision, the Board held that PSI failed to prove the specifications were defective. *See* 17-1 at 178,693-98.

6

### d. Trigger Assembly Separation Defect

PSI's "final example of the Board's incorrect factual conclusions leading to improper legal conclusions occurs [at 17-1 at 178,705] in the Board's discussion of Separation Defects, which underlaid [sic] the Board's discussion of PSI's claims for an equitable adjustment for Lot 3-3A." It singles out the following portion of the decision:

> The LAT reports for Lots 2-1 and 2-2 recorded igniter assembly separations. In both instances, the reports stated the "[i]gniter assemblies separated from the can, post function." (Findings 63, 64) The summary LAT report for Lot 3-2 did not mention a trigger assembly separation. However, the individual test data sheets included notations stating that "housing fell off," which indicates a trigger assembly separation. There is no indication about the timing of the separation. (Finding 77)

(App. br. at 5-8 (citing 17-1 at 178,672-74), *see also* 17-1 at 178,705, § D.1, Separation Defects)

Appellant maintains that the Board erred by not acknowledging that the government was aware of post-functioning separations in Lot 3-3A and beforehand. PSI maintains that the government "certainly knew of and allowed rescreening efforts throughout Interfix 1" (app. br. at 8). According to PSI, the Board mistakenly concluded that this information did not establish when the separations occurred. It maintains that the government was aware of one separation that occurred during functioning and another that occurred post-function in Lot 3-2. Appellant asserts that for Lot 3-2, as well as Lots 2-1 and 2-2, "There was substantial evidence at the trial establishing that the separations occurred both during and post-function, and the documentary evidence collected contemporaneously by PSI and by the Government's inspectors confirmed this." (*Id.* at 6)

The timing of the separations is critical, as rejection is warranted for violating the requirement that "[d]uring function igniter shall not separate from the outer container." 17-1 at 178,664, finding 16. The decision had determined that PSI "failed to prove that prior to Lot 3-3A, the government knowingly failed to object to trigger assembly separations like the one witnessed during Lot 3-3A." 17-1 at 178,705.

Two things stand out in reviewing appellant's argument. First, several paragraphs on pages 7 and 8 of PSI's brief in support of its motion are the same language found in appellant's initial post-hearing brief at pages 30 and 31. The Board

7

fully considered those assertions and related argument in the decision, and PSI furnished no new evidence or other reason to compel reconsideration. Second, the transcript relied upon by PSI's motion does not support its contention that the government allowed rescreening as early as Interfix 1. When Mr. Bowen was asked whether the government agreed previously to "rescreen any other lot than that lot, Lot 3-2 for leakers," he responded that "[w]e discussed that option in [Lot] 1-10; but I don't know as it was ever officially submitted for that" (tr. 3/157). Similarly, testimony from Mr. Goodrich, an engineering team leader for PSI (tr. 2/154), spoke generally about retesting lots that failed the leak test (tr. 2/157), but did not establish this as a regular practice approved by the government.

The testimonies of Mr. Bowen and Mr. Goodrich fall short of convincing us to reconsider. There is insufficient proof that the parties entered into a wider agreement that PSI would be permitted to rescreen lots any time there was a sealing test failure. Although the government permitted appellant to do so in Lot 3-2, there was a bargained-for exchange resulting in the government's obtaining additional units. There was also insufficient proof of the timing of the separations, and that the government knew these had occurred during functioning. Further, the "government had the discretion to determine that the benefit of additional units was not worth the time of the government employees to witness the screening." 17-1 at 178,705.

PSI's argument fails. The decision found that appellant failed to prove that the government was aware of alleged post-functioning separations or that it failed to object to these prior to Lot 3-3A. *See* 17-1 at 178,705-06. The evidence relied upon here by appellant was fully considered and weighed in making the decision; PSI simply disagrees with the conclusion reached by the Board.

### 4. PSI's Allegations Regarding the Shifting Burden of Proof

In addition to the alleged factual errors discussed above, PSI contends that the Board improperly shifted the burden of proof to appellant. It cites the transcript at the outset of the hearing, in which Judge Page explained that the "government bears the burden of proof in showing that [the] termination was appropriately done [and that appellant has] the right to rebut the government's assertions regarding the propriety of the termination." Both Mr. Karlson (a corporate officer representing PSI) and government counsel assured the Board that they had no questions regarding these relative burdens of proof. (App. br. at 8-9 (citing tr. 1/14)) However, appellant now complains that "throughout the Opinion by Administrative Judge Page, the Board improperly shifts the burden of proof to PSI" (*id.* at 9).

The decision sets forth the standard of review, which recognizes that a termination for default is a "drastic sanction that should be imposed only for 'good

grounds and on solid evidence.'" 17-1 at 178,692 (quoting *J.D. Hedin Construction Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969)). While "[t]he government bears the burden of proving the propriety of the default termination," once "the government satisfies its burden of proving that the termination for default was justified, then appellant must prove that its default was excusable, caused by the government's material breach, or that the CO's termination decision was arbitrary, capricious or an abuse of discretion." *Id.* (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); and *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 15-1 BCA ¶ 35,957 at 175,707); *see also United Healthcare Partners, Inc.*, ASBCA No. 58123, 16-1 BCA ¶ 36,374 at 177,312; *Lan-Cay, Inc.*, ASBCA No. 56140, 12-1 BCA ¶ 34,935 at 171,761.

As detailed in the decision's findings, the government established a *prima facie* basis for terminating the contract for default due to the contractor's failure to timely and acceptably perform. The CO properly adhered to regulation and policy in effectuating the termination. *See, e.g.*, 17-1 at 178,687-90, findings 168-177, at 178,692-700, § I, discussion. Under our precedent, once a *prima facie* case of the propriety of the default was established by the government, PSI then became responsible for proving that the termination for default was wrongful and should be converted to a termination for the convenience of the government. *See, e.g.*, 17-1 at 178,692 and cases cited therein. PSI's argument that reconsideration is appropriate because the Board improperly shifted the burden of proof is unconvincing, as it failed to adequately rebut the government's evidence of the contractor's default.

### 5. Appellant's Allegations Regarding Bad Faith and Various Evidentiary Rulings

Before trial, PSI did not articulate bad faith as a legal theory underlying its right to recover. PSI attempted at the hearing to examine witnesses regarding alleged government bad faith, but had mixed results in having that testimony admitted. After the government objected to PSI including this argument in its initial post-hearing brief (*see* 1st app. br. at 62-75), the parties were ordered to brief the issue of jurisdiction. The Board found jurisdiction, but held that appellant failed to prove that the government acted in bad faith. 17-1 at 178,700-02.

In seeking reconsideration, PSI asserts: "Now that the Board has determined that evidence of the Government's bad faith in dealing with PSI is relevant and admissible, the Board should reopen the record in the matter to allow PSI to present all of the relevant evidence in its possession of the government's bad faith" (app. br. at 9). After noting that government counsel "objected continuously and consistently to the presentation of any evidence by PSI as to the Government's bad faith," appellant said that "Judge Page, correctly, allowed PSI to tender some evidence of the Government's bad faith (but not all of the evidence that PSI was prepared to present)" (*id.*).

9

The contractor makes four main contentions in support of its position. These are that "the rulings from the Board as to the admissibility of the evidence are inconsistent, and sometimes wrong"; "the nature of the rulings shifts throughout the trial, allowing more and more of the evidence in, at least for its probative value, but no effort is made to correct the prior rulings excluding some of the same evidence"; "the Government's long speaking objections often indicated to witnesses exactly how they should respond to the questions from PSI"; and, "the sometimes-confusing colloquies and rulings prevented the Board from truly understanding the interplay of the several contracts being overseen by the same Government officials and the bias and bad faith than ran rampant throughout the administration of all of those contracts." (App. br. at 16-17)

PSI fails to cite a Board rule, Federal Rule of Evidence (FED. R. EVID.), or other authority that the Board has violated,[2] nor does it adequately explain for each example how the Board erred. The contested questioning was not rejected because it dealt with bad faith *per se*, but because PSI failed to lay a proper foundation; demonstrate the relevance of the attempted examination; or establish that it was not eliciting unacceptable hearsay from a nondeclarant (*see, e.g.*, examples cited by PSI at tr. 1/45-48, 72-74, 95-96). Appellant was allowed to proceed after laying at least a minimal foundation and the testimony was accepted for its probative value (*see, e.g.*, further examples at tr. 1/73-74, 98-99) and after narrowing the scope of cross-examination to matters raised during direct questioning (tr. 4/131-34). We have fully considered the examples urged by appellant as erroneous or inconsistent evidentiary rulings, and find that these do not warrant re-opening the hearing.

---

[2] *See, e.g.*, ASBCA Rule 10 HEARINGS, ¶ (c) NATURE OF HEARINGS; FED. R. EVID. 104(b) RELEVANCE THAT DEPENDS ON A FACT; FED. R. EVID. 401 TEST FOR RELEVANT EVIDENCE; FED. R. EVID. 602 NEED FOR PERSONAL KNOWLEDGE; FED. R. EVID. 801(c) HEARSAY; FED. R. EVID. 801(d) STATEMENTS THAT ARE NOT HEARSAY; and FED. R. EVID. 802 THE RULE AGAINST HEARSAY. The Board is not bound by the Federal Rules, but looks to these for guidance. *See* ASBCA Rule 10(c); *Laguna Constr. Co.*, ASBCA No. 58324, 14-1 BCA ¶ 35,748 at 174,947-80. In addition to appropriate evidence admissible under the Federal Rules, "the Board will consider evidence admissible in the sound discretion of the presiding judge." *KBJ, Inc.*, ASBCA No. 58512, 16-1 BCA ¶ 36,289 at 176,983. At its discretion, the Board may accept evidence for its probative value. The ultimate weight afforded such evidence may be influenced by such factors as the reliability and credibility of the witness. That analysis need not be articulated on the transcript or in the decision, as "to do so would result in in interminable and unreadable decisions" and transcripts. *Northrop Grumman Corp.*, ASBCA No. 52178 *et al.*, 05-2 BCA ¶ 32,992 at 163,523-24.

10

## CONCLUSION

PSI largely seeks reconsideration by attempting to re-litigate assertions and arguments that were rejected in the Board's decision. It also raises presumably inconsistent or erroneous evidentiary rulings on the part of the Board in an attempt to reopen the hearing, without sufficiently articulating a basis for reconsideration. We have considered all evidence and assertions in support of PSI's motion. Adhering to the guidance set forth in *Relyant*, 18-1 BCA ¶ 37,146 at 180,841 (and related opinions) and for the reasons stated herein, we deny PSI's motion.

Dated: April 10, 2019

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57890, 58335, 59103, Appeals of Pyrotechnic Specialties, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11