ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Axxon International, LLC | ) | ASBCA No. 61549 |
| | ) | |
| Under Contract No. W912P5-16-C-0002 | ) | |

APPEARANCE FOR THE APPELLANT:
Eric Lee, Esq.
  Lee & Amtzis, P.L.
  Boca Raton, FL

APPEARANCES FOR THE GOVERNMENT:
Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Bonnie B. Jagoditz, Esq.
  Engineer Trial Attorney
  U.S. Army Engineer District, Nashville

OPINION BY ADMINISTRATIVE JUDGE MELNICK

This appeal arises out of the termination for cause of a contract between Axxon International, LLC (Axxon) and the United States Army Corps of Engineers (Corps) for pump repairs to Wheeler Lock in Florence, Alabama. We have jurisdiction pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109. The parties have elected to proceed solely upon the record submitted pursuant to Board Rule 11. We deny the appeal.

FINDINGS OF FACT

1. On May 24, 2016, the Corps awarded Axxon the above-captioned firm fixed-price commercial item service contract (contract) for the replacement of "wash down" and "gate spray" pumps on Wheeler Lock. The work to be performed included the removal of existing equipment and materials and the installation of new equipment, including a new control system. The contract included six line items (CLINs) for demolition, pump platforms, pumps, pipes and fittings, valves and strainers, and electrical equipment and conduit. (R4, tab 4 at 1-5) The delivery date was March 23, 2017 (*id*. at 19).

2. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (MAY 2015) (R4, tab 4 at 20). Subparagraph (m), which addresses termination for cause, reads as follows:

The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

FAR 52.212-4(m)

3. The contract also incorporated by reference FAR 52.232-40, PROVIDING ACCELERATED PAYMENTS TO SMALL BUSINESS SUBCONTRACTORS (DEC 2013) (R4, tab 4 at 20).[1] Subparagraph (a) of that clause states in part the following:

Upon receipt of accelerated payments from the Government, the Contractor shall make accelerated payments to its small business subcontractors under this contract, to the maximum extent practicable and prior to when such payment is otherwise required under the applicable contract or subcontract, after receipt of a proper invoice and all other required documentation from the small business subcontractor.

FAR 52.232-40(a)

---

[1] This clause first appeared in the FAR as a result of a series of Office of Management and Budget (OMB) memoranda specifying that agencies should accelerate payments to prime contractors so that they could promptly pay their small business subcontractors. *See* FAR; Accelerated Payments to Small Business Subcontractors, 78 Fed. Reg. 70477-01 (Nov. 25, 2013). Originally intended to be a temporary policy, it was extended several times through subsequent OMB memoranda. *See* OMB Memorandum M-17-13 (Jan. 11, 2017). It expired on December 31, 2017, *id.*, and has not been renewed since then.

4. By purchase order dated May 26, 2016, Axxon entered into an agreement with B.H. Craig Construction Company (Craig) to perform the work contemplated by the contract for a price of $358,400 (later increased to $365,400).[2] The purchase order divided the work into six CLINs mirroring the CLINs contained in Axxon's contract with the Corps. (R4, tab 15 at 9) Under a heading entitled "Terms," the purchase order has an entry stating "31 Days from Government Acceptance" (*id*.). The purchase order also includes the following paragraph:

> By your signature herein below, you hereby warrant and represent that you acknowledge Axxon International, LLC as the prime contractor with respect to any and all communication with the U.S. Government and furthermore that you, as a subcontractor to Axxon, will not interact with any personnel representing the Federal Government regarding this contract. All communications will be conducted exclusively with Axxon International, LLC unless, and only in the event, that Axxon authorizes such other communication to you in writing.

(*Id.*)

5. By email dated August 12, 2016, Axxon advised the Corps that it projected completion of all CLINs by November 17, 2016. It also requested a contract modification for progress payments "under either, FAR 52.232-14[,] Notice of Availability of Progress Payments Exclusively for Small Business Concerns [,] FAR 52.232-16[,] Progress Payments, [o]r other FAR clause as may be appropriate." (R4, tab 64) Neither of those clauses appear in the contract, either in full text or incorporated by reference (R4, tab 4 at 20-29), and there is no evidence in the record that the Corps ever issued the requested contract modification. Nevertheless, at some point the Corps agreed to make progress payments to Axxon (app. supp. R4, tab 60 at 10-12).

6. By email dated September 9, 2016, Axxon submitted an invoice to the Corps in the amount of $116,400, which it described as representing "20% of contract value" for CLINs 0002 through 0006 "based upon our measurable progress timeline to early contract completion, plus material costs and tooling and technical work thus far performed" (app. supp. R4, tab 50 at 1). Axxon subsequently submitted documentation the Corps had

---

[2] We were not provided with a copy of the original purchase order between Axxon and Craig. Instead, we received what appears to be a version of the original purchase order, modified to reflect the increased value. This version of the purchase order was executed on August 3, 2016. (R4, tab 15 at 9-10) As neither party has objected to the authenticity of this document as reflecting the original agreement between Axxon and Craig, we will accept it as such.

requested for this payment, and stated that "[t]his will be our only progress payment request on this contract, with the remaining balance to be invoiced only after turn-key acceptance of the entire project . . ." (app. supp. R4, tab 52 at 1-2). Notwithstanding that representation, Axxon submitted four additional invoices for progress payments between October 2016 and March 2017 (app. supp. R4, tabs 43-45, 51).

7. By March 8, 2017, the Corps had paid all five invoices submitted by Axxon, representing complete payment on all CLINs but CLIN 0003, for which $14,100 remained unpaid (app. supp. R4, tabs 44 at 3, 60 at 17-19, 58; ex. A at 6-7; R4 tab 72). Under CLIN 0003, the Corps was still awaiting receipt of as-built and redlined drawings. In addition, final testing to allow for acceptance of the project as a fully functional system had yet to occur. (R4, tab 60 at 19-20)

8. Meanwhile, during the course of performance the parties realized that a number of system components not included in the contract's original specifications were nonfunctional. Without replacement, the contract's verification and testing requirements could not be completed. (R4, tab 6; app. supp. R4, tab 60 at 23-24) The Corps, therefore, decided to modify the contract to add CLIN 0007, which required that the nonfunctional system components be removed and replaced with contractor-supplied materials. By letter dated March 9, 2017, the Corps sent Axxon a request for proposal (RFP) for that additional work. (R4, tab 5 at 1)

9. By email dated April 6, 2017, Axxon proposed to perform the additional work for $162,037 and requested a "lead time" of 45 days (R4, tab 10). Prior to the parties' execution of the new modification, however, Axxon requested an additional 45 days to perform to account for, among other things, weather, submittals from its subcontractor, and the acquisition of materials necessary to complete the repairs (R4, tab 13 at 3). Although the additional 45 days would extend the delivery date to August 20, 2017, Axxon assured the Corps that it would not change the proposed price (*id*. at 1, 3).

10. On May 31, 2017, the parties executed Modification No. P00003 (Mod 3), which added CLIN 0007 and increased the price of CLIN 0004 to cover other materials required to complete the repairs, for a total price of $162,037. Mod 3 also extended the delivery date to August 20, 2017. (R4, tab 14 at 1; app. supp. R4, tab 60 at 26-28)

11. At the same time that Axxon and the Corps were discussing the proposed modification, Axxon's subcontractor Craig contacted the Corps to ask whether Axxon had received any progress payments, noting that it had not yet been paid for work it had performed. Although Craig requested an in-person meeting with the Corps to discuss the issue, that meeting never occurred. (R4, tab 12; app. supp. R4, tab 60 at 24-26)

4

12. By email dated June 19, 2017, Craig representative Jason Reaves contacted Roy Rossignol, a Corps small business representative, to request assistance in obtaining payment from Axxon. Mr. Rossignol forwarded Mr. Reaves' message to contracting officer Isaac Taylor, who contacted Axxon with the apparent intention of prompting it to pay Craig. (R4, tab 15 at 3-6) That call was not successful, however, because by email dated June 30, 2017, Mr. Reaves advised Mr. Rossignol that Craig was still awaiting payment. According to Mr. Reaves, Axxon had informed Craig that "they would pay us for the original contract September 1st 2017 and . . . within 7 days of completion of [Mod 3]." Mr. Reaves indicated that his superior was still concerned "about completing more work when we have not been paid [in] full for the original contract." (*Id.* at 1-2)

13. Later that same day, Mr. Reaves forwarded to Mr. Taylor a copy of the purchase order between Craig and Axxon, as well as two invoices addressed to Axxon and dated December 6, 2016 and March 27, 2017. The value of those two invoices equaled the entire purchase order price of $365,400. (R4, tab 15 at 1, 8-11)

14. The record indicates that at some point the Corps decided to raise the issue with Axxon more directly. Corps contracting personnel held several telephone conferences with Axxon to address the subject. (App. supp. R4, tab 60 at 31-32) By email dated July 7, 2017, Axxon's contract manager, Art Ward, informed Mr. Taylor that:

> [T]he actual supplemental work at Wheeler Lock & Dam is proceeding apace. So are the continuing payment arrangements with the subcontractor. Please look for at least weekly emails from me henceforth, as we see the project through to completion and final payment to our subcontractor.

(R4, tab 16 at 2)

15. Unsatisfied by Mr. Ward's representation that subcontractor payments were "proceeding apace," Mr. Taylor replied to him on the same date, reminding him that Axxon's contract with the Corps included FAR 52.232-40, which he quoted in full. He disputed Mr. Ward's contention, apparently made via telephone earlier that day, that Axxon was not required to pay Craig prior to completion of the contract. Noting that the Corps had accepted and paid Axxon in full for four CLINs for which work had been completed, he "encouraged" Axxon to promptly pay Craig for the corresponding work. (R4, tab 16 at 1)

5

16. On August 11, 2017, with the contract's delivery date fast approaching, contracting officer's representative Michael Murphy emailed Mr. Ward at Axxon with the following request:

> The end of the performance period for your contract is quickly approaching. I have not received a project schedule, updated AHA submittal or additional requests for access for employees. I am greatly concerned that you will not have the necessary time to complete your work. Please provide the required submissions as soon as possible to avoid further project delays.

(R4, tab 19 at 3) Mr. Ward responded that he would submit the information the following Monday, August 14 (*id.* at 2).

17. On August 15, 2017, still awaiting the required submissions from Mr. Ward, Mr. Murphy contacted Mr. Taylor's office to determine whether he wished to extend the period of performance. In response, Nashville Branch Contracting Chief Heather Turner asked whether or not Axxon was paying its subcontractors. Mr. Murphy advised that earlier that day, Craig had indicated it still had not received any payment, and that although Axxon had asked it for schedule and AHA submittals, it didn't intend to comply with that request. (R4, tab 17 at 1-2; app. supp. R4, tab 60 at 34-35)

18. Axxon did not provide Mr. Murphy with the required submissions as promised. Instead, on August 16, Mr. Ward informed him that Axxon would not be able to meet the August 20, 2017 deadline. Representing that Craig had informed him that it could "be on-site for the new work within just one week, and they expect to actually . . . complete all work within [eight] weeks[,]" Mr. Ward stated that he intended to request an extension of the performance period another nine weeks, until October 27, 2017. (R4, tab 19 at 1-3) He formally requested that contract extension a few hours later (R4, tab 20).

19. By email dated August 19, 2017, Mr. Taylor forwarded to Axxon a show cause notice advising that it was in default for inexcusable contractor delays and for failing to make accelerated payments to its subcontractor Craig, as required by FAR 52.232-40. The show cause notice denied Axxon's request to extend the period of performance but indicated it would be permitted to continue performing under a revised schedule with a new delivery date of October 27, 2017. The notice further directed Axxon to submit a plan within 10 days that would allow it to meet that new date. (R4, tab 22 at 1-3)

6

20. In its response to the show cause notice, Axxon disputed that it was required to make what it referred to as "advance payments" to Craig. Axxon also represented that it had already paid Craig in full for three CLINs, and that Axxon and Craig had negotiated for the "retirement" of two more prior to completion of the contract modification. (R4, tab 24 at 3) However, Axxon did not provide the Corps with any documentation or other evidence to support its assertion that Craig had been paid.

21. The record indicates that in September and October 2017, Axxon communicated with the Corps on several occasions about the possibility of assigning its claims under Mod 3 to Craig. By email dated September 27, 2017, Axxon advised the Corps that it was forwarding by U.S. mail documents it referred to as a "notice of assignment" and an "instrument of assignment" executed by the parties. (R4, tab 25 at 2-3) Those two documents do not appear in the Rule 4 file or elsewhere in the record.

22. By email dated October 2, 2017, a Corps representative informed Mr. Ward that under FAR 32.802(b), an assignment of claims could only be made to a bank, trust company or other financial institution (R4, tab 25 at 2). By email dated October 4, 2017, Mr. Ward forwarded to Mr. Taylor summaries of telephone conversations between and among Axxon, Craig and the Corps discussing Craig's intention to arrange for a financial institution to accept the assignment on its behalf (R4, tab 26).

23. At some point Axxon apparently made another request for assignment, because by email dated October 16, 2017, Mr. Ward requested an update from Mr. Taylor on the request. In his October 16 email, Mr. Ward stated that while it appeared Craig was "invoking" assignment as a prerequisite to commencing performance, Axxon was "confident of rapidly achieving an alternative solution with [Craig]" if the request was denied. (R4, tab 27 at 1) Mr. Taylor responded by email of the same date stating that the Corps' legal department had determined that "the Assignment of Claims (AOC) dated October 9, 2017 [was] not valid and enforceable" because it only covered a portion of the monies due ($162,037) rather than "all unpaid amounts payable under the contract" ($176,137) (R4, tab 28). The record does not include a copy of this October 9, 2017 purported assignment document.

24. By email dated October 17, 2017, Mr. Ward reiterated his request for an assignment of claims, this time for all unpaid amounts, and identified a bank in Atlanta as the assignee. Mr. Taylor responded two days later, advising that Mr. Ward's solution was still not viable because the notice of assignment had to come directly from the assignee, which had to be registered separately with the government. (R4, tab 29 at 1-2)

25. By email dated October 25, 2017 – two days prior to the delivery date set by the Corps in its show cause notice – Mr. Ward informed Mr. Taylor that Craig had

declined to perform the work covered by Mod 3 due to the parties' inability to work out an assignment arrangement. He also stated that "[f]inal settlement to [Craig] will be in accord with the terms of our purchase order, pending government acceptance and payment of the remaining $14,100 of CLIN 0004 . . . ." He then requested that Mod 3 be terminated for convenience. (R4, tab 30 at 1-2)

26. The next day Mr. Ward contacted Mr. Taylor via email again and suggested certain financial concessions Axxon would make if the Corps agreed to its request for a convenience termination. At the same time, however, Mr. Ward indicated that Axxon was "aggressively seeking an alternative subcontractor" to perform Mod 3 in lieu of termination if the Corps so preferred. He estimated that Axxon could provide the Corps with a proposal for that new subcontractor within 14 days. (R4, tab 30 at 1)

27. By letter dated November 2, 2017, Craig informed the Corps that as of October 26, 2017, it had only been paid $95,500 of the $365,400 it was owed under its purchase order with Axxon, leaving $269,900 unpaid (R4, tab 70).

28. On November 6 and 8, 2017, Mr. Ward emailed Mr. Taylor requesting site visits for two potential subcontractors (R4, tabs 30 at 4, 31 - 32). On November 15, 2017, Mr. Ward again requested site visits for the two proposed subcontractors, estimating that he could present a proposal within 10 days of the visits and indicating that Axxon would agree to reduce the original contract price (R4, tab 33 at 2-3). There is no evidence that the Corps responded to Mr. Ward's site visit requests.

29. By email dated November 17, 2017, Mr. Taylor informed Mr. Ward he intended to terminate the contract for cause "within the next few business days" (R4, tab 33 at 2). Although Mr. Ward acknowledged receipt of that email on November 21, 2017 (*id*. at 1), by email dated December 19, 2017, he reiterated his offer to submit a proposal for the two new subcontractors "within 10 days of site visit" (R4, tab 34). The record contains no evidence that the Corps responded to this email.

30. The record contains one email exchange on November 6, 2017 between Axxon and an apparent representative of one of the potential alternative subcontractors, in which the subcontractor requests a site visit prior to submitting a quote (R4, tab 31 at 1-2). Aside from that email exchange, there is no evidence Axxon performed any work after October 27, 2017, the delivery date set in the show cause notice.

31. On January 5, 2018, the Corps issued a notice of termination informing Axxon that it was terminating Axxon's contract for cause due to inexcusable delays and failure to make accelerated payments to its small business subcontractor in accordance with the contract terms. The notice indicated that funds would be de-obligated for CLINs 0003, 0004 and 0007. (R4, tab 35) On February 8, 2018, the Corps issued Modification No. P00005 (Mod 5), a partial termination for cause effective January 5,

8

2018.  Mod 5 reduced the total contract price by $176,137, which represented reductions in the price for CLINs 0003 and 0004 and elimination of the entire value of CLIN 0007.  (R4, tab 38 at 1-2)

32.  As part of the record, Axxon submitted a sworn statement from Mr. Ward. In that statement, Mr. Ward avers that the terms of Axxon's agreement with Craig did not require it to make "advance payments" to Craig, and that Craig was not entitled to payment "until 31 days after full acceptance by the government."  Mr. Ward further avers that "[n]otwithstanding the foregoing, AXXON did in fact make certain payments to the subcontractor in anticipation of the subcontractor providing additional services pursuant to [Mod 3]."  (App. supp. R4, tab 62 ¶¶ 27-28)  Mr. Ward's statement provides no detail or other information regarding any payments Axxon made to Craig.

33.  Axxon timely appealed the termination for cause to the Board on March 1, 2018, and simultaneously filed its complaint.  In its complaint, Axxon alleged that the termination was improper because the Corps erroneously determined Axxon was obliged to make "advance payments" to Craig (compl. ¶¶ 11-12); that the Corps improperly interfered with Axxon's business relationship with Craig by advising Craig that it was entitled to "advance payments" (*id.* ¶¶ 14, 20, 23); and that but for the Corps' actions in preventing it from using a different subcontractor, it could have completed the work under Mod 3 (*id.* ¶¶ 25, 28).  Axxon also alleged that the termination was improper because "the original contract was fully performed" and only the work under Mod 3 was not completed (*id.* ¶¶ 17-18, 29).  In its request for relief, Axxon sought to have the termination for cause "reversed and removed" or alternatively "revised to a termination for convenience of [Mod 3] only" (*id.* at 6).

34.  The evidence establishes that Axxon never provided the as-built or redline drawings required by the contract, or performed the final testing required to determine whether the Corps could accept the project as a full and functioning system (app. supp. R4, tab 60 at 19-20, 37).

DECISION

Termination for default "'is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence.'"  *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969) (further citations omitted)). Because a termination for default is essentially a government claim, the Corps bears the burden of proving by a preponderance of the evidence that the termination was justified.  *See CKC Systems, Inc.*, ASBCA No. 61025, 19-1 BCA ¶ 37,385 at 181,750 (citing *Thunderstruck Signs*, ASBCA No. 61027, 17-1 BCA ¶ 36,835 at 179,504).  If the Corps meets that burden, Axxon must show that "its default was caused by an

occurrence beyond its control and without its fault or negligence, or that the contracting officer['s] decision was arbitrary or capricious or an abuse of discretion." *Third Coast Fresh Distribution, L.L.C.*, ASBCA No. 59696, 16-1 BCA ¶ 36,340 at 177,194. The principles underlying terminations for default apply equally to terminations for cause under FAR 52.212-4(m). *See AEY, Inc.*, ASBCA No. 56470, *et al.*, 18-1 BCA ¶ 37,076 at 180,469; *Genome-Communications*, ASBCA Nos. 57267, 57285, 11-1 BCA ¶ 34,699 at 170,844.

Under the commercial item contract clause, the Corps had the right to terminate Axxon's contract for cause, in whole or in part, "in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance" (finding 2). The Corps' termination action was based upon appellant's inexcusable delays and its failure to pay its subcontractor Craig in accordance with the contract's terms (finding 31). We discuss each of these rationales in turn below.

The Corps' Termination Decision Was Justified

Axxon's failure to meet its delivery deadline justified the termination for cause. The purpose of Mod 3 was to repair certain components not covered by the original contract, which would have allowed final testing to take place and, if successful, delivery of a fully functional system. The parties mutually agreed upon a delivery deadline of August 20, 2017. (Findings 8-10) After Axxon informed the Corps that it would be unable to meet that deadline, the Corps sent Axxon a show cause notice that set a revised delivery date of October 27, 2017. It is undisputed that Axxon failed to meet the October 27, 2017 deadline, and in fact Axxon never delivered a full and functioning system to the Corps. (Findings 25, 29, 31, 34; *see* gov't br. at 17; *see also* app. br. at 12 (noting Mod 3 work was still not complete as of November 2018)). A contractor's failure to make timely delivery of agreed-upon goods or to complete the contract work establishes a *prima facie* case of default. *See DayDanyon Corp.*, ASBCA No. 57611 *et al.*, 14-1 BCA ¶ 35,507 at 174,039; *Truckla Services, Inc.*, ASBCA Nos. 57564, 57752, 17-1 BCA ¶ 36,638 at 178,445. The Corps has, therefore, proven its *prima facie* case that the termination for cause was justified.

Axxon's failure to comply with FAR 52.232-40 also justified the termination decision. The government may terminate a contractor for default for failure to perform the contract's specified services or "any of the other provisions of the contract, provided that the 'other provision' of the contract is a 'material' or 'significant' requirement." *A-Greater New Jersey Movers, Inc.*, ASBCA No. 54745, 06-1 BCA ¶ 33,179 at 164,432 (quoting *Precision Products*, ASBCA No. 25280, 82-2 BCA ¶ 15,981 at 79,247). In this appeal we consider FAR 52.232-40 to be a "significant" or "material" requirement because Axxon's noncompliance with the clause led to its inability to meet two delivery dates, the loss of its subcontractor and

its ultimate failure to provide a fully functional system. Axxon could have resolved the noncompliance after the Corps issued the show cause notice, but it did not. It disputed its obligation to comply with the clause, and even as late as October 25, 2017, in its request to terminate the contract for convenience, it indicated that it would make final payment to Craig "in accord with the terms of our purchase order, pending government acceptance." (Findings 20, 25) We, therefore, find that Axxon's failure to comply with FAR 52.232-40 provided a separate and independent justification for the termination.

Axxon's Default Was Not Excusable

The burden of proof now shifts to Axxon to prove that its default was excusable or that the termination was arbitrary, capricious or an abuse of the contracting officer's discretion. *See Third Coast Fresh Distribution, L.L.C.*, 16-1 BCA ¶ 36,340 at 177,194. Axxon does not challenge the Corps' assertion that it did not meet its contractually required delivery deadline. Instead, Axxon appears to argue that the Corps is responsible for Craig's refusal to perform under Mod 3, not Axxon, because Corps representatives improperly informed Craig it was entitled to accelerated payments and later refused to accept Axxon's purported assignment of claims.

Axxon first asserts that it was not required to make "advance payments" to Craig under FAR 52.232-40, and that the Corps interfered with Axxon's relationship with Craig by informing Craig otherwise. In support of its position, Axxon argues that it sought and received "progress payments" not under FAR 52.232-40, but under authority of the progress payment clause and another clause regarding notice of progress payments, neither of which appear in the contract. (App. br. at 8-11; app. reply br. at 4; finding 5). Axxon also asserts that under its purchase order with Craig, it was not required to make payment until 31 days after full acceptance of the work by the government (app. br. at 1, 4, 11; app. reply br. at 3). We disagree.

Axxon's arguments ignore the contract's incorporation by reference of FAR 52.232-40, which explicitly requires that contractors make accelerated payments to their small business subcontractors "[u]pon receipt of accelerated payments from the Government."[3] That obligation applies "to the maximum extent practicable and

---

[3] In the record and in their submissions to the Board, the parties use various terms ("progress," "advance" and "accelerated") to describe the Corps' payments to Axxon and the disputed payments owed to Craig. The clause itself uses only the term "accelerated payments" but does not define it. In response to questions requesting that the term be clarified, the drafters of the final rule stated that "[t]he flexibility in the clause language is intended to accommodate varying contractor capabilities to make accelerated payments." 78 Fed. Reg. 70477-01. For purposes of this appeal, therefore, we consider the term "accelerated

prior to when such payment is otherwise required" – in other words, regardless of any subcontract terms to the contrary. (*See* finding 3)  The only limitation on Axxon's obligation to pay Craig was receipt of appropriate documentation (*id*.), which Craig provided (finding 13).[4]

The evidence establishes that between September 2016 and March 2017, Axxon submitted five invoices for work in progress, and by March 2017, Axxon had received full payment from the Corps for five of the six CLINs (findings 6-7).  Having received accelerated payments from the Corps, Axxon was obligated under the contract to make accelerated payments to Craig.  It did not.

The record includes invoices from Craig to Axxon dated December 6, 2016 and March 27, 2017.  In June and August 2017, Craig notified the Corps that it had not yet been paid, and even as of November 2, 2017, Craig was still owed $269,900.  (Findings 12-13, 17, 27).[5]  Thus at the time the Corps issued the show cause notice and as of the extended delivery deadline of October 27, 2017, Axxon was not in compliance with FAR 52.232-40.

Although Axxon has claimed at various points that it did make some payments to Craig (findings 14, 20, 32; app. br. at 4-5, 10; app. reply br. at 1, 4-6), those assertions are vague and conclusory, and provide no details such as when payment occurred or the payment amounts.  Axxon has also never provided any documentary evidence of these supposed payments, such as bank statements, cancelled checks or proof of electronic transfers (findings 20, 32).  In these circumstances, we do not find Axxon's payment assertions to be credible.

Axxon further alleges that the Corps improperly refused to allow it to assign its right of payment to Craig (app. br. at 5, 11; app. reply br. at 4-6).  Although Axxon objects to the notion that it was required to comply with FAR 32.802, asserting that it was merely trying to "direct payment to [Craig,] not to effectuate an assignment" under that provision (app. br. at 11), that distinction is meaningless.  Axxon has not shown that it complied with FAR 32.802, which contains mandatory requirements for a lawful assignment under the Assignment of Claims Act, 31 U.S.C. § 3727 and

---

payments" to encompass the payments the Corps made to Axxon between September 2016 and March 2017 (findings 6-7).

[4] While another limitation might be whether Craig qualified as a small business subcontractor, the record contains no evidence that it did not, and Axxon has not challenged the applicability of the clause on that basis.

[5] Although Axxon claims that "[t]here is no record evidence as to how much was owed to [Craig,]" (app. reply br. at 5), it has never disputed the accuracy or validity of Craig's invoices, or its assertion in November 2017 as to how much it was still owed.

12

41 U.S.C. § 6305 (findings 21, 23). Axxon has also not identified, and we are unaware of, any mechanism permitting the government to pay monies due a contractor to another entity absent compliance with FAR 32.802. *See also* FAR 52.212-4(b) (describing when assignment is permitted).

We note that Axxon's defense against the termination includes certain statements, in its complaint and elsewhere, alleging that the Corps failed to cooperate with Axxon and otherwise interfered in its relationship with Craig (*see* finding 33; app. br. at 10-11; app. reply br. at 5-6). The Corps has simply required compliance with the contract and with relevant FAR provisions. There was nothing improper about Corps personnel answering Craig's payment questions. Any restriction upon Craig's ability to communicate with the government was not binding upon the Corps.

Finally, Axxon has not made the demonstration necessary to show that the termination was an abuse of discretion. *See Bulova Technologies Ordnance Systems LLC*, ASBCA No. 59089, 18-1 BCA ¶ 37,183 at 180,988 (citations omitted).

The Scope of the Termination Does Not Impact Our Decision

Finally, we note that in its complaint and briefs, Axxon attempts to distinguish between the contract that the parties originally entered into in March 2016 and Mod 3, executed on May 31, 2017. Axxon avers that the termination was improper because "the original contract was fully performed" and only the Mod 3 work remained uncompleted (finding 33; *see* app. br. at 9-10; app. reply br. at 5-6). In addition, the relief it seeks in its complaint is to have the termination "revised to a termination for convenience of [Mod 3] only" (finding 33). We do not find this distinction to be relevant, as the termination applied only to unperformed work (finding 31; *see* gov't br. at 17-18; gov't reply br. at 3).

CONCLUSION

The appeal is denied.

Dated: March 24, 2020

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

13

I concur                                        I concur

RICHARD SHACKLEFORD                             OWEN C. WILSON
Administrative Judge                            Administrative Judge
Acting Chairman                                 Vice Chairman
Armed Services Board                            Armed Services Board
of Contract Appeals                             of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61549, Appeal of Axxon International, LLC, rendered in conformance with the Board's Charter.

Dated:  March 26, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

14